CENTRAL OF GEORGIA RAILROAD
COMPANY et al., Plaintiffs,

v.

The UNITED STATES of America and the
Interstate Commerce Commission
et al., Defendants.

Civ. A. No. 2565–72.

United States District Court,
District of Columbia.

Aug. 7, 1974.

Michael Boudin, Washington, D. C., for plaintiffs.

Richard J. Hardy, Washington, D. C., for intervening defendants.

Raymond M. Zimmet, Washington, D. C., for the ICC and the United States.

Before McGOWAN, Circuit Judge, and HART and PRATT, District Judges.

## OPINION

McGOWAN, Circuit Judge:

Plaintiff rail carriers challenge certain orders entered by the Interstate Commerce Commission in rate proceedings under the Interstate Commerce Act, 49 U.S.C. § 1ff. Those proceedings are characterized by the Commission as involving "a situation which to our knowledge has not heretofore been presented for our consideration in a formal proceeding," namely, the invocation of Section 15(7) of the Act to change a tariff by terminating a multiple-car rate.[1] The novelty of the issue has prompted the Commission to reformulate the burden of proof statutorily imposed upon a carrier initiating a rate alteration under Section 15(7), and, by reference to such revised burden, to invalidate the new schedule. In so doing, we think the Commission has failed to reflect accurately the legislative scheme of rate regulation embodied in the Act, particularly Sections 15(1) and 15(7) thereof. For the reasons set forth hereinafter, the prayer of the complaint for an injunction against the Commission's action is granted.

### I

Under the Interstate Commerce Act, as in so many regulatory statutes modeled upon it, it is the regulated utility that sets the rate in the first instance, subject always to the statutory standards of justness and reasonableness, and the avoidance of discriminatory or preferential treatment. A question of justness and reasonableness may be raised either as to a rate already lawfully in effect, or on the occasion of. a proposal by the carrier to effect a change in an existing rate.

Section 15(1) is addressed to the former situation.[2] Under it the Com-

---

[1]. A multiple-car, or multicar, rate, as it is variously referred to, is defined by the Commission as one which applies only to a shipment tendered on one bill of lading from one consignor to one consignee at a single destination in quantities exceeding the capacity of a single car and which is lower than the contemporaneously applicable rate on the same commodity tendered in single-car quantities.

[2]. That section provides:

Whenever, after full hearing upon a complaint made as provided in section 13 of this title, or after full hearing under an order for investigation and hearing made by the Commission on its own initiative, either in extension of any pending complaint or without any complaint whatever, the Commission shall be of opinion that any individual or joint rate, fare, or charge whatsoever demanded, charged, or collected by any common carrier or carriers subject to this chapter for the transportation of persons or property as defined in section 1 of this title, or that any individual or joint classification, regulation, or practice whatsoever of such carrier or carriers subject to

the provisions of this chapter, is or will be unjust or unreasonable or unjustly discriminatory or unduly preferential or prejudicial, or otherwise in violation of any of the provisions of this chapter, the Commission is hereby authorized and empowered to determine and prescribe what will be the just and reasonable individual or joint rate, fare, or charge, or rates, fares, or charges, to be thereafter observed in such case, or the maximum or minimum, or maximum and minimum, to be charged, and what individual or joint classification, regulation, or practice is or will be just, fair, and reasonable, to be thereafter followed, and to make an order that the carrier or carriers shall cease and desist from such violation to the extent to which the Commission finds that the same does or will exist, and shall not thereafter publish, demand, or collect any rate, fare, or charge for such transportation other than the rate, fare, or charge so prescribed, or in excess of the maximum or less than the minimum so prescribed, as the case may be, and shall adopt the classification and shall conform to and observe the regulation or practice so prescribed.

mission may at any time, on complaint or on its own motion, initiate an investigation of the lawfulness of an existing rate; and, if it determines that such rate is in fact unlawful, it is empowered to determine and prescribe the rate, or the maximum or minimum, or maximum and minimum, thereafter to be observed. The burden of proving the unlawfulness of the existing rate rests upon the party challenging it. Although the statute does not in terms allocate the burden of proof, it has uniformly been construed as imposing that burden on the challenger of the existing rate. Louisville & N. R. R. v. United States, 238 U.S. 1, 35 S.Ct. 696, 59 L.Ed. 1177 (1915); Darling & Co. v. Alton & S.R.R., 299 I.C.C. 393, 398 (1956); Colorado Milling & Elevator Co. v. Atchison, T. & S. F. Ry., 303 I.C.C. 21, 24 (1958).

Section 15(7), by contrast, is directed to the circumstance where a carrier proposes to make a change in an existing rate.[3] It provides that, whenever such a change is filed with the Commission, the latter may, upon complaint or upon its own initiative, enter upon a hearing with respect to the lawfulness of the proposed rate. Pending hearing and decision of that question, the Commission may suspend the operation of the new rate, but not for longer than seven months. Whether the hearing is completed before or after the expiration of the suspension period (at which time the carrier may begin to charge the new rate), the Commission may make such order with respect to the new rate as it could under Section 15(1) with respect to an existing rate. If the Commission has not acted before the new rate becomes effective, it may, in the case of an increased rate, enter an accounting order requiring the carrier to keep track of the additional amounts received because of the increase; and it may direct refund of such portions of the increase as it may ultimately find to be unlawful. At any hearing involving a change in

3. That section provides:

Whenever there shall be filed with the Commission any schedule stating a new individual or joint rate, fare, or charge, or any new individual or joint classification, or any new individual or joint regulation or practice affecting any rate, fare, or charge, the Commission shall have, and it is hereby given, authority, either upon complaint or upon its own initiative without complaint, at once, and if it so orders without answer or other formal pleading by the interested carrier or carriers, but upon reasonable notice, to enter upon a hearing concerning the lawfulness of such rate, fare, charge, classification, regulation, or practice; and pending such hearing and the decision thereon the Commission, upon filing with such schedule and delivering to the carrier or carriers affected thereby a statement in writing of its reasons for such suspension, may from time to time suspend the operation of such schedule and defer the use of such rate, fare, charge, classification, regulation, or practice, but not for a longer period than seven months beyond the time when it would otherwise go into effect: and after full hearing, whether completed before or after the rate, fare, charge, classification, regulation, or practice goes into effect, the Commission may make such order with reference thereto as would be proper in a proceeding initiated after it had become effective. If the proceeding has not been concluded and an order made within the period of suspension, the proposed change of rate, fare, charge, classification, regulation, or practice shall go into effect at the end of such period; but in case of a proposed increased rate or charge for or in respect to the transportation of property, the Commission may by order require the interested carrier or carriers to keep accurate account in detail of all amounts received by reason of such increase, specifying by whom and in whose behalf such amounts are paid, and upon completion of the hearing and decision may by further order require the interested carrier or carriers to refund, with interest, to the persons in whose behalf such amounts were paid, such portion of such increased rates or charges as by its decision shall be found not justified. At any hearing involving a change in a rate, fare, charge, or classification, or in a rule, regulation, or practice, after September 18, 1940, the burden of proof shall be upon the carrier to show that the proposed changed rate, fare, charge, classification, rule, regulation, or practice is just and reasonable, and the Commission shall give to the hearing and decision of such questions preference over all other questions pending before it and decide the same as speedily as possible.

the applicable rate under Section 15(7), the statute expressly places the burden of proof upon the carrier to show that the proposed change is just and reasonable.

It will be noted from the foregoing that the Commission's power to prescribe what the future rate shall be, or to set minimum and maximum limits within which a rate will be deemed to be lawful, comes into being only when the Commission has found the existing or the proposed rate, as the case may be, to be unjust and unreasonable. The provision with respect to minimum and maximum limits is also significant because it reflects the concept that there may be circumstances in which any one of several rates would be equally lawful, falling as they may within what the Supreme Court has termed "a zone of reasonableness . . . within which a carrier is ordinarily free to adjust its charges for itself." United States v. Chicago, M. St. P. & P. Ry., 294 U.S. 499, 506, 55 S.Ct. 462, 465, 79 L.Ed. 1023 (1935); and see Atchison, T. & S. F. R. R. v. Wichita Bd. of Trade, 412 U.S. 800, 812–814, 93 S.Ct. 2367, 37 L.Ed.2d 350 (1973).

The factors that enter into a determination by the Commission of justness and reasonableness have been identified in many Commission and court decisions interpreting the purposes entertained by Congress in its employment of that concept. One obvious consideration is the relationship between the rate and the cost of providing the service. A factor closely related to this is the question of whether an increased rate will result in a decline in the volume of the traffic in question by reason of the inability of the traffic to bear the increase or because other means of carriage will become available. Another area of inquiry is the extent to which the rate is justified or necessitated by competitive circumstances.

The question of who has the burden of proof on these and related issues is of *critical importance*. As we have seen, where the carrier is proposing a change in rate, Congress has expressly placed the burden upon it to show the justness and reasonableness of the proposed change. Contrarily, where the Commission moves to investigate the lawfulness of an existing rate and, having found it unlawful, prescribes a new one, the burden of proof is upon those who raise the challenge to the old rate and who seek the new prescription.

## II

This controversy involves the rates charged by the plaintiff rail carriers for the transportation of kaolin clay from the Toomsboro District of Georgia to the ports of Savannah and Port Wentworth, Georgia.[4] This movement is for export, as is also a rail movement of the clay from Toomsboro to Port Royal, South Carolina. Initially the export rate to the Georgia ports was $3.50 per ton on a minimum carload weight of 30 tons. In 1961 the carriers offered a new rate of $3.34 per ton for a single-car shipment with a minimum weight of 50 tons; and in 1962 a multiple-car rate of $2.88 per ton was made available for 10 or more such cars moving at the same time from Toomsboro to the Georgia ports. This last-mentioned rate was concededly made only for the purpose of responding to the complaint of the Toomsboro shippers that they were in competition with export clay producers in South Carolina who had a $2.88 per ton single-car rate to Savannah.

Intervening general rate increases had by 1969 brought the export rates from Toomsboro to the Georgia ports to levels of $3.18 per ton for a multiple-car shipment with a minimum of 500 tons; $3.-68 per ton for a single-car shipment with a minimum of 50 tons; and $3.96

---

4. Kaolin clay is heavily and increasingly in demand by the paper industry for both filling and coating purposes, and to a lesser extent by the rubber industry. England supplies 70 per cent of the clay in world trade, with the United States furnishing about 15 per cent. 90% of the latter is produced in Georgia and South Carolina.

for single-car shipments with a minimum of 30 tons.

Port Royal, South Carolina, is a port which competes with the Georgia ports for export clay from Toomsboro. Complaint was made to the carriers in 1969 that the multiple-car rate from Toomsboro to the Georgia ports afforded the latter an undue preference, to the prejudice of Port Royal. In the course of investigating this complaint the carriers came to believe that there were no continuing competitive conditions which justified the multiple-car rate. They also purported to find that the multiple-car rate was in fact not warranted by lower operating costs, and they concluded that termination of the multiple-car rate would have no significant adverse effect on the volume of shipments from Toomsboro to the Georgia ports. For these reasons, and because of their need for additional revenues, the carriers filed tariff changes under Section 15(7) cancelling the multiple-car rate.

Protests were forthcoming from the intervening defendants in this proceeding—the Georgia Ports Authority, the operator of the port facilities at Savannah and Port Wentworth, and United States Clay Producers Traffic Association, Inc., a trade association representing the Toomsboro shippers. The new tariffs were suspended for the full seven-months period, and an investigation instituted.[5] The suspension period ended after the submission of evidence and briefs but before decision, and the new tariffs become effective.[6] An examiner's report was dispensed with by the Commission, which assigned the matter to a three-member review board for initial disposition.

The review board in its report made the following findings:

1. Whatever competitive justification there may have been for the multiple-car rate when it was initially established, the evidence shows that currently there is no competitive need for such rate.

2. No operating or cost considerations justify the multiple-car rate. The evidence establishes that multiple-car shipments and single-car shipments are handled in essentially the same way, and there are, accordingly, no operating economies or cost savings peculiar to the former. More switching, rather than less, is required for the multiple-car shipments, and cars used for such shipments are held by the shipper for a significantly longer period of time (3.29 days before shipment) than cars used for single shipments (1.7 days before shipment).

3. The single-car rates now applicable for what were formerly multiple-car movements are not unreasonable in relation to costs of service. The multiple-car rate exceeded variable costs, but fell short of covering the weighted average fully distributed costs. The single-car rates exceeded variable costs by 36.3 percent, and fully distributed costs by 7.6 percent, which the Board found to be not an unjust or unreasonable return.

4. The altered rates will not affect adversely the volume of export shipments from Toomsboro to the Georgia ports. There is no significant motor carrier or other competition for the hauling of such traffic. Clay exports have increased substantially during the preceding years despite increases in the multiple-car rate by reason of general rate increases. The transportation cost to the shippers had increased some 4 percent during the previous decade as compared with a 41 percent increase in the value of the clay.

5. The case was heard on modified procedure, but there was some live testimony and cross-examination.

6. An accounting order under Section 15(7) was eventually entered, looking toward a possible refund. The operation of this order has, however, been stayed by the Commission pending judicial review.

The review board dealt also with a contention that the carriers' position was inconsistent with what were said to be the claims of the plaintiff Southern Railway in Grain in Multiple-Shipments, 325 I.C.C. 752 (1965). The board found from the evidence that different handling practices were necessary for the clay traffic as distinguished from grain traffic, and that this explained the difference in the consequences of the respective multiple-car rates. The review board, in sum, concluded that the proposed rates were lawful in view of the findings by it from the evidence that there were no considerations of either cost or competition which justified the continuance of multiple-car rates lower than single-car rates.

Review of this decision was afforded by a three-member panel of the Commission acting as an appellate division. The division recited expressly that it found "the Board's statement of facts to be accurate and, as supplemented herein, we adopt it as our own." The division addressed itself in particular to the four critical findings of fact relied upon by the review board in concluding that the carriers had adequately met the burden of showing the justness and reasonableness of the new rate. It said, for example, that "we think it clear that if there ever was a competitive necessity for the multicar rate from the Toomsboro district, that necessity has disappeared." It found that the single-car rate "exceeds the weighted average variable cost by 98¢ and the weighted average distributed cost by 26¢, or by 36.3% and 7.6%, respectively"; and it went on to say that this rate did not "appear to be excessive when viewed solely in relation to the cost of service." The division further said that the evidence "supports the [carriers'] contention that elimination of the multicar rate, with a consequent 50-cent increase in the rate, will not significantly impede the export clay movement." Lastly, the division said that "it is clear, as found by the review board, that no savings in clerical, switching, or other costs are in fact realized in the handling of multiple-car as opposed to single-car shipments."

The making of these findings did not, however, cause the division to reach the same result as did the review board. It concluded that the carriers had not satisfied their burden of proof for the following reason:

" . . . Having voluntarily established and maintained reduced rates for multicar shipments, *carriers seeking cancellation must also show the existence of circumstances or conditions by virtue of which they could not reasonably be expected to achieve cost savings normally inherent in multiple-car service.* Absent this requirement shippers and others who benefit from and have come to rely upon multicar rates would be particularly vulnerable to sudden sharp increases in rates whenever, due to cessation of competitive pressures or other reasons, carriers lost interest in continuing the high degree of operational efficiency required to effect such a savings." (Emphasis supplied).

The division closed by saying that "there is no indication that [carriers] were prevented by internal operational difficulties from handling and tending multiple cars as a unit"; and it added that it did not appear that "shippers or operators of port facilities were unwilling or unable to accept such tenders and otherwise cooperate in enabling [carriers] to achieve potential cost savings."

The Commission accepted for filing the carriers' petition for reconsideration of the division's action, but eventually denied the petition without opinion. In that petition the carriers asserted that the Commission had, after the administrative hearings were finished, imposed a new requirement which was invalid as a matter of law because the "statutory obligation in a Section 15(7) proceeding was to show that the new rate was just and reasonable in light of the actual tariff conditions and operating practices and not to negate the possibility of potential costs saving under some other set

of tariff conditions or operating practices." The carriers further asserted that the new requirement was based upon a factual premise that had no support in the record. Lastly, they claimed that they were, at the very least, entitled to a remand for further hearings in which they would have the opportunity to meet the burden of proof as so enlarged.

### III

It is now suggested for the first time in this court that the carriers made no effort to carry the burden of proof imposed upon them by Section 15(7). This is true, so it is said, because the carriers sought only to demonstrate that the single-car rate already in being was just and reasonable as applied to single-car traffic. We think, as did the Commission throughout the course of the proceedings before it, that the carriers were undertaking to show by evidence that the single-car rate, as applied to the traffic formerly moving under the multicar rate, was lawful. And this, it seems to us, is and must be the central issue before the Commission when the carrier acts to cancel a multicar rate, which is precisely the action—and the only action—proposed by the plaintiffs in this case.

No one before us claims that a multicar rate once offered by a carrier must be continued by it forever, or that Section 15(7) does not provide a means by which cancellation of such a rate may be effected. The Commission did not reject the Section 15(7) filing in this case as beyond the contemplation of that statute. To the contrary, it invoked its suspension power under that provision

of the Act and set the matter for hearing. Since the only proposal filed was a cancellation of the multicar rate, the purpose of that hearing was to explore the validity of the remaining single-car rates as applied to the traffic formerly moving from Toomsboro on the cancelled rate.

The carriers had, by the explicit command of the statute, the burden of proof on that issue. The hearing was focused on the factors traditionally regarded as relevant, that is to say, the reasonableness of the rate proposed to be changed in relation to costs, and its impact on the movement of export clay from Toomsboro. Findings on these questions in favor of the carriers were made by the review board and accepted by the Commission, as were also fact findings to the effect that no competitive justification for the multicar rate continued to exist nor did there appear to be any operating or cost considerations differentiating the cancelled rate from the one proposed to be applied.[7]

With these findings, the carriers would ordinarily be thought to have sustained the burden of proof imposed upon them by the statute. The Commission, however, said that "this showing of no actual savings" is not enough. It enlarged the burden of proof in this instance, after the hearing was over and at the appellate level of the administrative proceeding, to include a further showing of "the existence of circumstances or conditions by virtue of which they could not be reasonably expected to achieve cost savings normally inherent in multiple-car service." In particular, the Commission intimated that, if the carriers had imposed certain service con-

7. The significance of these last-mentioned findings for the ending of a multicar rate is evident from the Commission's characterization in this case of the showing that must be made in order to get a multicar rate in the first place:

> . . . Multicar rates, however, favor shippers who are able to tender large volumes of traffic at one time; and they

have been allowed only in the absence of unjust discrimination evidenced by a clear showing of material differences in transportation circumstances and conditions. . . . That burden has usually been satisfied by persuasive evidence of a need to meet competition and a showing of cost savings attendant upon the movement of large volumes at one time . . .

ditions upon the availability of the multicar rate, savings might have been realized.

 These are, at best, highly speculative assumptions upon which to base a belated expansion of the carriers' burden of proof; and we think that they, and the timing and manner of their intrusion into this proceeding, fall outside the congressional contemplation of the reach of Section 15(7). This record provides no support for the premise that multicar rates are inevitably and universally characterized by significant cost savings.[8] That may or may not be the case, depending upon the conditions surrounding the particular traffic movement; and no confident answer can be forthcoming until the matter has been the subject of individual investigation.

Neither does this record afford any clear support to the contentions now made that, if savings have not in fact been realized in this case, that is due to the carriers' own operating inefficiency or failure to impose tariff conditions with respect to the use by the shippers of the service.[9] The parties to this record, as we have heretofore noted, addressed themselves mainly to other questions, and these matters were touched upon only sporadically and tangentially. They have nothing like the record support necessary for the use made of them by the Commission in holding that the carriers failed to meet their burden of proof under Section 15(7).

The Commission is, of course, free at any time, upon complaint or on its own initiative to investigate, under Section 15(1), the plaintiffs' rates and the tariff conditions or operating practices affecting them, and, if it finds them unjust and unreasonable, to prescribe what they shall be for the future. In that proceeding the burden of proof, under the legislative allocation, will not be on the carriers. What the Commission cannot do without violating the statutory scheme is to turn a Section 15(7) case into a Section 15(1) investigation by failing to give effect to the undisturbed fact findings conclusive of the former, and by holding that a burden of proof appropriate to the latter has not been met.

The flavor of the Commission's opinion, made even sharper in brief and oral argument before us by the Government and the intervening defendants, is that cancellation of a multicar rate is invariably suspect as being in bad faith. The competitive justification having disappeared, the carrier, so it is said, is misusing its regained monopoly position. There is nothing in this record to support such an inference.

Under the Commission's own approach, a multicar rate is *prima facie* suspect because it discriminates between big and little shippers, and it must be justified by competitive considerations. Once those disappear the carrier is certainly under no moral compulsion to continue a rate which, as in this case, has been found to fall short of covering the full costs of providing the service. Rail carriers may find it necessary in many cases to make rates covering only variable costs in order to retain the traffic as against other modes or to protect their

---

8. For example, in Volume Rates on Processed Meat, 322 I.C.C. 456 (1964), the Commission said (at 469):
 On this record, the demonstrated economies, if any, incurred in performing multiple-car service in contrast to single-car service on the instant traffic are *insignificant*.

9. The Commission's decisional response to these considerations can fairly be characterized as contemplating that cost savings could perhaps be realized if the carrier would impose a tariff condition that shippers must accept *and* load multicar shipments *as single* units, thereby presumably reducing switching and waybill expense. A further tariff restriction should be directed to the length of time cars may be held by the shipper. The Commission did not undertake to predict what the potential savings would be, as it could not from the matter contained in the present record. Rather, it told the plaintiffs that their burden of proof extended to negating the possibility that such savings might be substantial.

shippers against competitive discrimination. The carrier who has only such rates will, over time, inevitably encounter problems of financial viability. This does not mean that a monopoly situation may be mercilessly exploited, since the carrier is a regulated monopoly and its rates must always meet the statutory standard of justness and reasonableness, as in this instance the proposed rate was explicitly found by the Commission to do. No user of the service has a vested right to anything more.

An abstract concern about monopolistic pricing cannot, accordingly, validate the Commission's action in this case. It holds the remedy for that evil in its own hands. The Commission therefore has no tenable basis, on this record and for this reason alone, for expanding the plaintiffs' burden of proof beyond what it would normally be in a Section 15(7) proceeding.

## IV

The parties do not dispute the finding of the review board, accepted by the Commission, that, as the latter put it, "no savings in clerical, switching, or other costs are in fact realized in the handling of multiple-car as opposed to single-car shipments." What is argued to us now is that it is the plaintiffs who are responsible for this state of affairs; and support for this proposition is summoned from the Commission's statement that "there is no indication that [carriers] were prevented by internal operational difficulties from handling or tendering multiple cars as a unit," and that

it does not appear that the users of the service "were unwilling or unable to accept such tenders or otherwise cooperate in enabling [carriers] to achieve potential cost savings."

Thus, the Commission reiterates its earlier assertion that the case made by the plaintiffs in the administrative hearing fails because it did not anticipate and negate assumptions having no foundation in the record. We are of the view that this, at least in the context of the affirmative findings here made, does violence to the concept of the burden of proof which the proponent of a rate alteration under Section 15(7) must sustain. To the extent, however, that it may be thought that the correct resolution of this controversy turns upon what the record shows in respect of the claims now made of operational inefficiency on the part of plaintiff, we have examined that record intensively.

What first emerges from such a survey is that the parties to the hearing did not consciously address themselves to the propositions subsequently relied upon by the Commission as invalidating the proposed rate. The plaintiffs, in support of that rate, introduced evidence relating to the costs of service; and that was the issue with which the hearing was largely concerned.[10] That evidence inevitably included some description of operations. Representatives of the carriers stated that the shippers did not load and tender the cars for shipment in 10-car units, partly because they chose to use some of the cars provided to accommodate single-car domestic orders,[11] and partly because they did not

---

10. The other major preoccupation of the hearing was the effect of the altered rate on the export movement of the clay. The Commission unequivocally accepted the finding by the review board on this question, stressing the evidence that the volume of such movement had increased steadily and dramatically throughout the prior decade despite general rate increases. The Commission concluded that the 50-cent increase (from $3.18 to $3.-68 a ton) flowing from the proposed change "will not significantly impede the export clay movement." The record showed that the

truck rate for clay was in excess of $6.00 per ton.

11. Even as to movement for export, the testimony was that shippers often elected to use single-car shipments because they were more efficient for some purposes, including the meeting of ocean vessel departure dates. Thus, despite the availability of the multicar rate, approximately one-third of the export clay actually moved on single-car rates.

It was also testified that shippers load the clay at random, according to the particular

in the main have the storage or loading facilities required for such group loading. The result was to prevent savings in switching costs, and to increase the time the cars were in the possession of the shippers, thereby adding a cost in terms of delay in car utilization—a cost that, incidentally, falls upon other rail carriers and other shippers as well.

One shipper only testified that delays in loading were caused by the plaintiffs' failure to supply cars, that its storage facilities were adequate to keep the different grades of clay separate and continuously ready for loading, and that, if cars were provided, 10-car units could be loaded in one day. This testimony, however, was weakened by admissions that this shipper, being by far the largest, was not typical of the other shippers in respect of storage facilities and flexible capacity for volume handling, and that even it frequently interrupted the export loadings in order to fill domestic orders as promptly as possible.

It is also pressed upon us now that savings in clerical costs were foregone because the plaintiffs used separate waybills for each car. This, so we are told, resulted from the plaintiffs having supplied too many defective cars. The record does contain a statement by a carrier witness that separate waybills were a guard against bad-order cars. But there was also testimony to the effect that bad-orders were due not only to the age of the equipment (which assertedly did not exceed ordinary stand-

ards of utilization and wear and tear), but also by the nature of the clay itself and the tendency of some shippers to overload the cars. The highly efficient, but extremely scarce, covered hopper cars had not been used for clay because of the long periods the cars were detained at the ports. It was represented, however, that 200 new such cars were being purchased by plaintiff Southern Railway for use in the clay traffic.

There were, of course, no findings made by the Commission with respect to any of these matters; and, indeed, on this markedly imprecise state of the record, findings of any real value would have been difficult to make. The fact appears to be that the parties did not try the case before the examiner by reference to the theory on which the Commission later decided it, and which the Government and the protestants urge upon us now. We are not to be understood as saying that under no circumstances could considerations of this kind be relevant with respect to the termination of a multicar rate. What we do hold is that the Commission, on this record and in the face of the findings accepted by it without question, could not properly find the plaintiffs deficient in terms of the burden of proof Congress intended them to carry.

Wherefore, it is ordered, adjudged, and decreed that the Commission's orders respectively served on January 4, 1972, May 9, 1972, and December 11, 1972, are hereby permanently enjoined, set aside and nullified.

---

grade of clay ordered and what grades are then available. After loading, the cars are, at the shipper's discretion, billed out either for export or to fill domestic orders. If a loaded car is designated for multicar export shipment, it must be held until at least nine

other such cars are ready. An assistant superintendent of the plaintiff Southern Railway testified that he could recall no instance in which all 10 cars were sequentially loaded *and* tendered for shipment at the same time.