549 F.2d 83
 BURLINGTON NORTHERN, INC., et al., Petitioners,
v.
UNITED STATES of America and Interstate Commerce Commission,
Respondents,
and
North Dakota Public Service Commission et al.,
Intervenors-Respondents.
 No. 76-1871.
 United States Court of Appeals,
Eighth Circuit.
 Submitted Dec. 15, 1976.
Decided Feb. 16, 1977.
 
 Curtis H. Berg (argued), St. Paul, Minn., Joseph J. Nagle, Omaha, Neb., and C. Harold Peterson, Minneapolis, Minn., on brief, for petitioners.
 Charles H. White, Jr., I. C. C., Washington, D. C., argued; Donald I. Baker, Asst. Atty. Gen., and Lloyd John Osborn, Atty., Dept. of Justice, Washington, D. C., Mark L. Evans, Gen. Counsel, and Peter A. Fitzpatrick, Asst. Gen. Counsel, I. C. C., Washington, D. C., on brief, for respondents.
 John I. Finsness (argued), Fargo, N. D., Ray H. Walton, and David W. Tiistola, Asst. Commerce Counsel, Bismarck, N. D., on brief, for intervenors-respondents.
 Before HEANEY, ROSS and STEPHENSON, Circuit Judges.
 HEANEY, Circuit Judge.
 
 
 1
 The petitioners seek to set aside an order of the Interstate Commerce Commission which prescribes a maximum rate for the rail shipment of export wheat from Minnesota, Montana, North Dakota and South Dakota to north Pacific coast ports.[1] The order effected a reduction in many then existing rates. The nature of this controversy requires a brief historical analysis of the contested rate structure and a review of the Commission proceedings underlying this litigation as background to our discussion of the merits of petitioners' claims.
 
 I.
 
 2
 Prior to 1965, the petitioning railroads maintained shipping rates for wheat transported from Minnesota, Montana, North Dakota and South Dakota to north Pacific coast ports for export which were linear in nature: that is, they varied according to distance, increasing in amount from west to east. At the close of 1964 and during 1965, the United States had a surplus of American hard red spring wheat. Japan expressed an interest in purchasing such wheat at north Pacific coast ports, provided that adequate supplies could be made available at prices competitive with Canadian wheat at Vancouver. To attract sufficient quantities of hard red spring wheat to north Pacific markets, the price offered there had to meet or exceed the price in Minneapolis since most wheat of this type is grown in a production area[2] governed by the price-setting market in Minneapolis. But for producers more distant from the Pacific coast than from Minneapolis, the price difference would have to be great enough to compensate for the higher freight costs they would incur by shipping west.
 
 
 3
 Under the market circumstances detailed above, the linear rate structure proved prohibitive and substantial wheat traffic to the west coast did not arise. Accordingly, the railroads established a special blanket export rate of 95 cents per hundred pounds for shipments from much of North Dakota and from stations in Montana. Once again, these rates were too high to move substantial traffic even though the United States Department of Agriculture had instituted a subsidy program to stimulate foreign sales.
 
 
 4
 In 1965, the railroads established an inverse rate structure, so labeled because it charged higher rates for shorter distances than for longer ones. These rates were computed on the basis of rail costs to Minneapolis and water carrier costs to New Orleans. They enabled producers in the four-state area who shipped wheat to the west coast for export to receive the same net return as on sales at Minneapolis.[3]
 
 
 5
 Acknowledging that the inverse rate structure violated the "long haul and short haul" provision[4] of the Interstate Commerce Act, the railroads sought an exemption from the Interstate Commerce Commission. The Commission is authorized to relieve carriers from the proscriptions of § 4 in special cases. On June 8, 1965, the Commission granted the exemption concluding that "the proposed rates are reasonably compensatory and necessary to meet the competition on foreign markets."[5]
 
 
 6
 In 1971, pursuant to its authority under 49 U.S.C. § 13(2), the Commission conducted an investigation into import/export rates to and from Pacific coast ports.[6] The railroads, parties from North Dakota, and parties from the Pacific coast ports all participated in extensive proceedings before an administrative law judge. With respect to the matters involved in this case, he concluded:
 
 
 7
 that the existing export rates on wheat from origins in North Dakota to the north Pacific coast ports were not shown to be excessively and unreasonably high from a cost of service standpoint; that these export rates on wheat, although they substantially exceed fully allocated costs, were not shown to be in excess of a maximum reasonable level and thereby unjust and unreasonable; that changed conditions since adoption of the inverse rate structure have rendered that rate structure obsolete and distorted to the point where these rates are unjust and unreasonable when compared with other rates; that the inverse rate structure on wheat from origins in Minnesota, Montana, North Dakota, and South Dakota to north Pacific coast ports is unjust and unreasonable to the extent they exceed a rate of 92.5 cents per hundred pounds at the Ex Parte No. 267-B level, plus subsequently authorized general increases; and that the rate of 92.5 cents at the Ex Parte No. 267-B level from this area to north Pacific coast ports will be compensatory and with the addition of subsequently authorized general increases the rate will be just and reasonable.
 
 
 8
 345 I.C.C. 423, 429 (1975).
 
 
 9
 The 92.5 cent rate was the lowest rate in the inverse rate structure at the time of the hearing examiner's decision. The rates ranged from 92.5 cents to $1.06.
 
 
 10
 The decision of the administrative law judge was appealed to the Commission which affirmed his findings and conclusions in an opinion dated December 12, 1975. 345 I.C.C. 423 (1975). The Commission felt there was no inconsistency in its finding that although the inverse rates were not excessive from a cost of service standpoint, that they were obsolete as well as unjust and unreasonable. The opinion noted that "the justness and reasonableness of rates cannot be determined solely upon the basis of cost considerations." 345 I.C.C. at 438. The Commission concluded that the imposition of inverse rate structure is justified only on a showing of special circumstances and conditions and concurred in the examiner's findings of changed conditions, citing the following examples:
 
 
 11
 elimination of the large surplus of hard red spring wheat; discontinuance of the Department of Agriculture subsidy program; reduction in export rates from some origins formerly subject to the inverse rate structure; application of a general rate increase to the westbound inverse rates without a similar increase on eastbound wheat rates; and a significant reduction in the eastbound wheat rates with no corresponding reduction in the westbound rate structure.
 
 
 12
 345 I.C.C. at 440.
 
 
 13
 The Commission entered, inter alia, the following "ultimate findings and conclusions:"
 
 
 14
 4. That the existing export rates on wheat from origins in North Dakota to the north Pacific coast ports have not been shown to be excessively and unreasonably high, in violation of section 1(5) of the act.
 
 
 15
 5. That, unless good cause be otherwise shown, the existing inverse rate structure on export wheat from origins in western Minnesota, eastern Montana, North Dakota, and northern South Dakota to the north Pacific coast ports is unjust and unreasonable to the extent these rates exceed a rate of 92.5 cents per hundred pounds at the Ex Parte No. 267-B level, plus subsequent authorized general increases.
 
 
 16
 6. That the above prescribed maximum rate will be compensatory and with the addition of subsequently authorized general increases will be just and reasonable.
 
 
 17
 345 I.C.C. at 442-443.
 
 
 18
 After affording the parties opportunity to show why the 92.5-cent maximum rate should not be prescribed, the Commission issued its final order on September 8, 1976, prescribing the aforesaid rate. The Commission limited the duration of its order to one year and concluded:
 
 
 19
 We believe that such a temporary order will afford necessary relief to petitioners, allow time for the parties to resolve their differences, and result in establishment of just and reasonable rates for the future.
 
 
 20
 345 I.C.C. at 442.
 
 
 21
 Thereafter, the petitioning railroads filed this timely petition for review. On October 20, 1976, we denied the petitioners' motion for a stay pending judicial review.
 
 II.
 
 22
 The petitioners first contend that the challenged order must be set aside because the Commission failed to make the findings which are a statutory prerequisite to the exercise of its rate prescription authority. Under 49 U.S.C. § 15(1), the Interstate Commerce Commission is authorized to prescribe rates only after it finds that the existing rates are "unjust or unreasonable or unjustly discriminatory or unduly preferential or prejudicial, or otherwise in violation of any of the provisions of this chapter." Rate orders entered in the absence of such findings cannot stand. See, e. g., United States v. Chicago, M., St. P. & P. R. Co., 294 U.S. 499, 504, 55 S.Ct. 462, 79 L.Ed. 1023 (1935); Central of Georgia R. R. Co. v. United States, 379 F.Supp. 976, 979 (D.D.C.1974), aff'd, 421 U.S. 957, 95 S.Ct. 1944, 44 L.Ed.2d 446 (1975).
 
 
 23
 We hold that the Commission made the findings required by statute. In ultimate finding number 5, set forth above, and in the discussion portion of its decision, 345 I.C.C. at 441, the Commission clearly stated that the existing rate structure was unjust and unreasonable. We disagree with the petitioners' argument that these findings were rendered ambiguous and, thus, inadequate as a matter of law by the Commission's finding that the rates were not excessively and unreasonably high in violation of 49 U.S.C. § 1(5). As the Commission noted in its opinion, rates may be reasonable from a cost-of-service standpoint but impermissible nevertheless if they violate some other prescription of the Act. See, e. g., New York v. United States, 331 U.S. 284, 344-345, 67 S.Ct. 1207, 91 L.Ed. 1492 (1947); Middlewest Motor Freight Bureau v. United States, 433 F.2d 212, 220 (8th Cir. 1970), cert. denied, 402 U.S. 999, 91 S.Ct. 2169, 29 L.Ed.2d 165 (1971). It is clear that the Commission found the rates to be unjust and unreasonable not because they were excessive from a cost-of-service standpoint, but because they violated the "long haul and short haul" provision of the Act and because the special circumstances which initially justified the inverse structure no longer existed.
 
 III.
 
 24
 The petitioners next contend that since the inverse rate structure was authorized by a § 4 exemption and since the only basis for finding the rates to be unreasonable was that the conditions prompting the exemption had changed, the Commission had authority to vacate its order granting § 4 relief and to permit the railroads to initiate new rates but not to prescribe new rates itself under § 15(1).
 
 
 25
 The petitioners' argument raises a difficult question concerning the proper relationship between sections 4(1) and 15(1) of the Interstate Commerce Act. The statute does not expressly define the proper relationship, and the parties have not directed our attention to any case squarely addressing this issue. We conclude, however, that under the circumstances of this case, the Commission was empowered to prescribe a maximum rate. The manner in which the inverse rate structure became unreasonable is unimportant. At the time of the Commission's action, the rates were unreasonable within the meaning of § 15(1) in that they violated the principles underlying § 4 of the Act.[7] The statutory condition precedent to the exercise of the Commission's rate prescription authority was thus satisfied. In addition, it should be noted that the Supreme Court has indicated, albeit in another context, that rates established pursuant to a grant of § 4 relief are not immune from attack under § 15(1). See United States v. Merchants & M. Traffic Asso., 242 U.S. 178, 37 S.Ct. 24, 61 L.Ed. 233 (1916).
 
 IV.
 
 26
 Finally, the petitioners challenged the Commission's determination of 92.5 cents per hundred pounds as the new maximum rate. They argue that it was unreasonable to prescribe the lowest rate existing in the inverse rate structure as a blanket maximum rate particularly since that structure was itself a depressed one. The railroads represent that if left to their own devices, they would have instituted either a blanket rate of $1.06, the highest rate within the inverse structure, or a new linear rate structure.
 
 
 27
 The ratemaking function of the Commission in this case most closely resembles an informal rulemaking procedure under the Administrative Procedure Act, 5 U.S.C. § 551 et seq. See National Ass'n of Food Chains, Inc. v. I. C. C., 175 U.S.App.D.C. 346, 351, 535 F.2d 1308, 1313 (1976). See also United States v. Allegheny-Ludlum Steel, 406 U.S. 742, 92 S.Ct. 1941, 32 L.Ed.2d 453 (1972). We review such informal rulemaking under the standards delineated in 5 U.S.C. § 706(2)(A-D), the most pertinent of which, in the context of this case, is the arbitrary and capricious standard. See National Ass'n of Food Chains, Inc. v. I. C. C., supra at 1313-1314; Independent Meat Packers Ass'n v. Butz, 526 F.2d 228, 238 (8th Cir. 1975), cert. denied,424 U.S. 966, 96 S.Ct. 1461, 47 L.Ed.2d 733 (1976); Verkuil, Judicial Review of Informal Rulemaking, 60 Va.L.Rev. 185 (1974).[8]
 
 
 28
 While judicial review under the arbitrary and capricious standard in general and of ICC rate orders in particular is limited in scope, see Atchison, T. & S. F. R. Co. v. Bd. of Trade, 412 U.S. 800, 806, 93 S.Ct. 2367, 37 L.Ed.2d 350 (1973), we, nonetheless, have a duty to thoroughly explore the record and carefully examine the Commission's conclusions to determine whether the Commission's findings are supported by the evidence and whether proper legal standards have been applied. See Citizens to Preserve Overton Park v. Volpe, 401 U.S. 402, 415, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971); Warren Transport, Inc. v. United States, 525 F.2d 148, 151 (8th Cir. 1975). As Judge Leventhal stated in Greater Boston Television Corporation v. F. C. C.,143 U.S.App.D.C. 383, 444 F.2d 841, 850, cert. denied, 403 U.S. 923, 91 S.Ct. 2229, 29 L.Ed.2d 701 (1971), quoted with approval in Collins v. S. E. C., 532 F.2d 584, 597 n. 25 (8th Cir. 1976):
 
 
 29
 A court does not depart from its proper function when it undertakes a study of the record, hopefully perceptive, even as to the evidence on technical and specialized matters, for this enables the court to penetrate to the underlying decisions of the agency, to satisfy itself that the agency has exercised a reasoned discretion, with reasons that do not deviate from or ignore the ascertainable legislative intent. "The deference owned to an expert tribunal cannot be allowed to slip into a judicial inertia." Volkswagenwerk Aktiengellschaft v. FMC, 390 U.S. 261, 272, 88 S.Ct. 929, 935, 19 L.Ed.2d 1090 * * * (1968).
 
 
 30
 On a basis of a thorough review of the record, we conclude that the Commission's prescription of 92.5 cents as the maximum rate should be sustained. First, detailed cost studies submitted by the North Dakota interests indicate that the 92.5-cent rate will be compensatory as to points in the eastern four-state area, and more than compensatory as to points in western North Dakota. Although the petitioners attack the cost evidence on a number of grounds, they concede that the rate will be compensatory, and no other cost evidence was submitted to the Commission. Second, the Commission found that "the cost study followed generally acceptable procedures and reasonably reflects the costs associated with wheat transportation from the considered area. 345 I.C.C. at 438. Finally, the prescribed rate is only a temporary measure and will expire one year after its effective date.
 
 
 31
 The petition to review and set aside the Interstate Commerce Commission's order is denied.
 
 
 
 [1]
 We have jurisdiction pursuant to 28 U.S.C. §§ 2321(a) and 2342(5). Venue is proper in that Burlington Northern maintains its principal office in this Circuit. 28 U.S.C. § 2343
 
 
 [2]
 Most hard red spring wheat is grown in Minnesota, Montana, North Dakota and South Dakota
 
 
 [3]
 The rates were flat rates; application of them did not involve factoring in distance. In 1971, the rate from Fargo, North Dakota, to Seattle was 92.5 cents per hundred pounds, while the rate from Belfield, North Dakota, to Seattle was $1.06. A shipper in Belfield thus paid 13.5 cents per hundred pounds more freight to Seattle than a shipper in Fargo, despite the fact that Belfield is two hundred and sixty-four miles closer to Seattle than Fargo
 
 
 [4]
 This provision is found at 49 U.S.C. § 4(1). It provides in pertinent part:
 It shall be unlawful for any common carrier subject to this chapter or chapter 12 of this title to charge or receive any greater compensation in the aggregate for the transportation of passengers, or of like kind of property, for a shorter than for a longer distance over the same line or route in the same direction, the shorter being included within the longer distance(.)
 
 
 [5]
 371st Supplemental Fourth Section Order No. 17200 Grain and Grain Products Within the Western District
 
 
 [6]
 Ex Parte No. 270 (Sub-No. 1A) Investigation of Railroad Freight Rate Structure Export/Import Rates and Charges Pacific Coast
 
 
 [7]
 While the petitioners disagree with the Commission's findings of changed circumstances, they do not challenge those findings in this litigation
 
 
 [8]
 Although we adhere to the arbitrary and capricious test as the standard of review for informal rulemaking, we note that there is a lack of uniformity on this point in the federal courts. A number of cases have applied the more stringent "substantial evidence" test. See Note, Judicial Review of the Facts in Informal Rulemaking: A Proposed Standard, 84 Yale L.J. 1750, 1752-1759 (1975)