565 F.2d 621
 NORTH DAKOTA STATE WHEAT COMMISSION and North Dakota Public
Service Commission, Petitioners,
Farmers Union Grain Terminal Association, Intervenor-Petitioner,
v.
UNITED STATES of America and Interstate Commerce Commission,
Respondents,
Soo Line Railroad Company, Burlington Northern, Inc.,
Chicago, Milwaukee, St. Paul and Pacific Railroad
Company, Intervenor-Respondents.
 No. 76-1990.
 United States Court of Appeals,
Eighth Circuit.
 Submitted May 19, 1977.
Decided Sept. 30, 1977.
Rehearing and Rehearing En Banc Denied Dec. 5, 1977.
 
 John I. Finsness, N. D. State Wheat Commission, Fargo, N. D., for petitioners; David W. Tiistola, N. D. Public Service Commission, Bismarck, N. D., on brief.
 Walter H. Walker, III, I. C. C., Washington, D. C., for respondents; Donald I. Baker, Asst. Atty. Gen. and Lloyd J. Osborn, Atty., Dept. of Justice, Washington, D. C., Mark L. Evans, Gen. Counsel, Charles H. White, Jr., Assoc. Gen. Counsel, I. C. C., Washington, D. C., on brief.
 C. Harold Peterson, Soo Line Railroad Co., Minneapolis, Minn., for intervenor, Soo Line Railroad Co.; William R. Power, Burlington Northern, Inc., St. Paul, Minn., and J. J. Nagle, Chicago, Ill., on brief.
 Before GIBSON, Chief Judge, and HEANEY and HENLEY, Circuit Judges.
 HENLEY, Circuit Judge.
 
 
 1
 This is an original proceeding brought by the North Dakota State Wheat Commission and the North Dakota Public Service Commission, hereinafter petitioners, for the purpose of setting aside an order of the Interstate Commerce Commission entered in 1976 approving tariff schedules filed in 1974 by three interstate rail carriers, which schedules substantially modified existing freight rates charged by the carriers for the transportation of wheat and certain other grains from points in the midwest to the Minneapolis-St. Paul, Minnesota area and to the Duluth, Minnesota-Superior, Wisconsin area.[1] Petitioners contend that the challenged order is contrary to law and lacks adequate evidentiary support in the record. We have jurisdiction by virtue of 28 U.S.C. §§ 2321(a) and 2342(5).
 
 
 2
 After the petition was filed, Farmers Union Grain Terminal Association intervened as a petitioner, and the affected carriers, which are the Soo Line Railroad Company, Burlington Northern Inc. and Milwaukee, St. Paul and Pacific Railroad Company, intervened as respondents.
 
 
 3
 At risk of some oversimplification, the background facts of the case may be stated substantially as follows:
 
 
 4
 As indicated, we are concerned with freight rates charged by railroads for the transportation of certain grains from points in the Dakotas, eastern Montana and western Minnesota to the "Twin Cities" and "Twin Ports" areas that have been mentioned.
 
 
 5
 For many years prior to May, 1960 the grain rates of the intervening respondents, hereinafter referred to at times simply as the carriers, had been fixed by various orders of the Commission, and the prescribed rates were uniform throughout the year. In consideration of the rates paid by them, shippers were entitled to a number of accessorial and other services which were provided by the carriers without additional charges.
 
 
 6
 As of May, 1960 the carriers were suffering severely from the competition of unregulated truckers, and the carriers undertook to meet that competition by reducing rates with offsetting reductions of services. In 1963 the carriers filed rate schedules which established seasonal variations in rates. The prescribed "summer" rates were higher than the "winter" rates. In 1971 there was a further reduction of rates as far as wheat was concerned. The seasonal rates were put into effect not only to meet competition from truckers but also for the purpose of evening out shipments of grain throughout the year by encouraging shipments during the months in which demand for rail transportation of grain was normally at a low ebb. Wheat had rates of its own. The other grains involved here were lumped together for rate purposes. The summer rates charged with respect to those grains are referred to in the record as "Group 3" rates, and the winter rates are referred to as "Group 4" rates.
 
 
 7
 By early 1974 two significant changes had taken place in the transportation industry as far as transportation of grain was concerned. In the first place, the competitive position of the railroads in relation to truckers had improved. In the second place, seasonal fluctuations in shipments of grain had become less severe than they had been in prior years. This was due largely to improved farm storage facilities which eased the necessity of farmers and elevator operators of moving vast quantities of grain immediately prior to and during the harvest season.
 
 
 8
 In such circumstances the carriers concluded that the reasons for establishing the seasonal variations in rates had disappeared, that elimination of the differentials would increase the revenues of the carriers, and that the differentials should be eliminated by making the summer rates applicable the year round. That decision was incorporated in the rate schedules that are challenged here and that were filed with the Commission in April, 1974. It was proposed that the new schedules would go into effect on May 1, 1974. While the new schedules eliminated the seasonal differentials in rates, they did not provide for the restoration of any services that had been eliminated or curtailed in connection with earlier rate reductions including services that had been eliminated or curtailed in connection with the establishment of the seasonal rates.
 
 
 9
 The new schedules were strongly opposed by petitioners, by the intervening petitioner, and by other protestants including the United States Department of Agriculture. Acting as then authorized by § 15(7), the Commission suspended the schedules for a period of seven months which expired on November 30, 1974. After that date the schedules went into effect and have remained in effect since that time.
 
 
 10
 On May 21, 1974 the Commission entered an order requiring the carriers to submit to the Commission and to the protestants such cost studies as the carriers intended to introduce in evidence and to make certain underlying documents available to the Commission and to the protestants. Since the carriers did not propose to justify the proposed schedules by reference to costs of service, they did not comply with that order.
 
 
 11
 The Commission referred the controversy to an administrative law judge, who held an evidentiary hearing in July, 1974. Since the new schedules had been filed pursuant to § 15(7), and since the schedules had been challenged in the interest of shippers, the burden was upon the carriers to establish that the rates incorporated in the new schedules were just and reasonable.[2]
 
 
 12
 At the hearing before the administrative law judge, the carriers did not introduce any cost evidence. In order to show that the proposed rates were reasonable, the carriers relied primarily on the fact that the proposed rates were lower than the original "full service" rates that the Commission had approved in the 1930's plus various increases in those rates,[3] and on the general need of the railroads for more money. The carriers urged that since the proposed rates were lower than the "No. 17,000" rates, they were within the zone of reasonableness, and that the selection of particular rates within that zone was a matter of managerial discretion.[4]
 
 
 13
 On October 15, 1974 the administrative law judge filed a detailed opinion. He held that the burden was on the carriers to establish the reasonableness of the proposed rates, and he concluded that the carriers had failed to discharge their burden. The judge rejected the "managerial discretion" argument of the carriers; he also held that the proposed rates on wheat and other grains could not be justified by reference to the general need of the railroads for more revenues. And, he felt that the proposed rates could not be justified by comparing them with the old "No. 17,000" rates.
 
 
 14
 Perhaps more basically, the judge was of the opinion that in its order of May 21, 1974 the Commission had determined that the carriers must establish the reasonableness of the proposed rates by cost evidence, and that they had made no effort to do so. The judge refused to approve the proposed rates and ordered them cancelled.
 
 
 15
 It is to be observed that in the course of the proceedings before the administrative law judge it developed that many of the shippers did not seriously quarrel with the proposition that the maintenance of seasonally differentiated rates had served its purpose and that the seasonal differentials should be eliminated. Those shippers took the position, however, that the summer rates that the carriers proposed to put into effect on a year-round basis were too high, and that lower year-round rates should be prescribed. Their position seems to have been appealing to the administrative law judge.
 
 
 16
 The carriers sought and obtained reconsideration of the administrative law judge's decision by the Commission's Review Board No. 4. The Board reversed the administrative law judge in an opinion handed down in September, 1975 which was several months after the summer rates had gone into effect on a year-round basis.
 
 
 17
 The Board first held that the administrative law judge had misconstrued the Commission's order of May 21, 1974 as determining that the carriers were required to establish the validity of their proposed rates by cost evidence, and the Board held that such evidence was unnecessary. And the Board then proceeded to find that the carriers had established the reasonableness of the proposed rates.
 
 
 18
 In its discussion of the reasonableness of the new rates, the Board stated that the need for seasonally adjusted rates had ceased to exist, but that that fact alone did not establish the validity of the proposed rates since it was required to be shown that the rates in question were themselves just and reasonable. And, the Board found that the reasonableness of the proposed year-round rates was established by the fact that the summer rates on wheat and the other grains were themselves reasonable, and that adequate reasons for the application of those rates to the remaining months of the year had been shown.
 
 
 19
 With specific regard to the absence of cost evidence the Board said:
 
 
 20
 . . . The precise cost of service in this instance is immaterial, for we must assume that the cost during the winter season is no lower than during the summer season. It is obvious from the record that the lower winter rate scale was not predicated on cost considerations.
 
 
 21
 The protestants obtained a review of the Board's decision by the Commission's Division 2, which sat as an appellate division, and the Board's decision was upheld in an order-opinion that was served on September 15, 1976. That order-opinion of Division 2 amounted to a final determination by the Commission.
 
 
 22
 The Commission found, first, that due to changes in conditions which have been mentioned "the varying freight rates designed to encourage off season shipment, and thereby, level out the flow of grain no longer are effective means of accomplishing this goal."
 
 
 23
 The Commission then stated that it deemed it to be in the public interest to encourage innovative ratemaking including the establishment of rates based on seasonal or peak period demand, and that it considered its position to be consistent with the policy expressed in § 202(d) of the 1976 statute heretofore cited. The Commission went on to say that "to encourage such innovation the Commission must of necessity permit the ratemaker to amend or to rescind the innovation when the reasons for its establishment have changed or disappeared."
 
 
 24
 The Commission agreed with the Board that the determination of just and reasonable rates is not to be measured solely by cost evidence, and that to require cost evidence in all cases "would seriously limit the exercise of flexible judgment."
 
 
 25
 The Commission then stated that in the instant case a valid test of the reasonableness of the proposed rates would be "a favorable comparison with rates on the same or similar commodities in the same general area," and the Commission found that "the summer level of wheat rates and the Group 3 grain rates are suitable for this purpose."
 
 
 26
 Proceeding, the Commission pointed out that the summer rates were in effect and were moving traffic prior to their cancellation as summer rates, and that the seasonal differential between rate levels was no longer a significant factor affecting the timing of the flow of grain to market. The Commission was also of the view that the fact that the summer rates were not published originally to be applicable year round "does not invalidate the use of these rates for comparative purposes," and that the fact that since they went into effect year round the summer rates have been moving the grain "is a further indication that they do not exceed a maximum reasonableness level."
 
 
 27
 The ultimate finding of the Commission was that in the circumstances "(the carriers have) presented sufficient justification for the cancellation of the lower scale of rates and the resulting rate increases."
 
 
 28
 Thereafter, the instant proceeding was commenced in this court.
 
 
 29
 In seeking to set aside the order of the Commission the petitioners contend ultimately that the order is contrary to law and lacks adequate evidentiary support. Without limiting the generality of that contention, petitioners urge that the Commission was guilty of certain specific errors: (1) That the Commission erred in approving the proposed rates without supporting cost evidence. (2) That the Commission impermissibly indulged a presumption that rates which have been in effect and have moved traffic are presumptively reasonable and by so doing shifted the burden of proof in the case from the carriers to the protestants. (3) That the Commission erred in applying the "4 R" statute to the case and in its construction of the statute, assuming that it was applicable. (4) That the Commission erred in permitting the seasonal rate variations to be eliminated without any corresponding restoration of services that were discontinued or curtailed as an incident to the establishment of the variations.
 
 
 30
 Both sides concede that the scope of our review of an order of the Commission is a narrow one. As stated in Atchison, Topeka & Santa Fe Ry. v. Wichita Board of Trade, 412 U.S. 800, 806-07, 93 S.Ct. 2367, 2374 (1973):
 
 
 31
 Judicial review of decisions by the Interstate Commerce Commission in rate cases necessarily has a limited scope. Such decisions 'are not to be disturbed by the courts except upon a showing that they are unsupported by evidence, were made without a hearing, exceed constitutional limits, or for some other reason amount to an abuse of power.' Manufacturers R. Co. v. United States, 246 U.S. 457, 481 (38 S.Ct. 383, 62 L.Ed. 831) (1918). As this Court has observed, 'The process of rate making is essentially empiric. The stuff of the process is fluid and changing the resultant of factors that must be valued as well as weighed. Congress has therefore delegated the enforcement of transportation policy to a permanent expert body and has charged it with the duty of being responsive to the dynamic character of transportation problems.' Board of Trade of Kansas City v. United States, 314 U.S. 534, 546 (62 S.Ct. 366, 372, 86 L.Ed. 432) (1942).
 
 
 32
 The delegation to the Commission is not, of course, unbounded, and it is the duty of a reviewing court to determine whether the course followed by the Commission is consistent with its mandate from Congress. See ICC v. Inland Waterways Corp., 319 U.S. 671, 691 (63 S.Ct. 1296, 1307, 87 L.Ed. 1655) (1943); Burlington Truck Lines, Inc. v. United States, 371 U.S. 156, 167-169 (83 S.Ct. 239, 245-246, 9 L.Ed.2d 207) (1962). Cf. NLRB v. Wyman-Gordon Co., 394 U.S. 759, 767 (89 S.Ct. 1426, 1430, 22 L.Ed.2d 709) (1969) (opinion of Fortas, J.). . . .
 
 
 33
 Dealing specifically with the scope of review available in a ratemaking case, this court recently said in Burlington Northern, Inc. v. United States, 549 F.2d 83, 88-89 (8th Cir. 1977):
 
 
 34
 The ratemaking function of the Commission in this case most closely resembles an informal rulemaking procedure under the Administrative Procedure Act, 5 U.S.C. § 551 et seq. See National Ass'n of Food Chains, Inc. v. I. C. C., 175 U.S.App.D.C. 346, 351, 535 F.2d 1308, 1313 (1976). See also United States v. Allegheny-Ludlum Steel, 406 U.S. 742, 92 S.Ct. 1941, 32 L.Ed.2d 453 (1972). We review such informal rulemaking under the standards delineated in 5 U.S.C. § 706(2)(A-D), the most pertinent of which, in the context of this case, is the arbitrary and capricious standard. See National Ass'n of Food Chains, Inc. v. I. C. C., supra, 175 U.S.App.D.C. at 351-352, 535 F.2d at 1313-1314; Independent Meat Packers Ass'n v. Butz, 526 F.2d 228, 238 (8th Cir. 1975), cert. denied, 424 U.S. 966, 96 S.Ct. 1461, 47 L.Ed.2d 733 (1976); Verkuil, Judicial Review of Informal Rulemaking, 60 Va.L.Rev. 185 (1974).
 
 
 35
 While judicial review under the arbitrary and capricious standard in general and of ICC rate orders in particular is limited in scope, see Atchison, T. & S. F. R. Co. v. Bd. of Trade, 412 U.S. 800, 806, 93 S.Ct. 2367, 37 L.Ed.2d 350 (1973), we, nonetheless, have a duty to thoroughly explore the record and carefully examine the Commission's conclusions to determine whether the Commission's findings are supported by the evidence and whether proper legal standards have been applied. See Citizens to Preserve Overton Park v. Volpe, 401 U.S. 402, 415, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971); Warren Transport, Inc. v. United States, 525 F.2d 148, 151 (8th Cir. 1975). As Judge Leventhal stated in Greater Boston Television Corporation v. F. C. C., 143 U.S.App.D.C. 383, 444 F.2d 841, 850, cert. denied, 403 U.S. 923, 91 S.Ct. 2229, 29 L.Ed.2d 701 (1971), quoted with approval in Collins v. S. E. C., 532 F.2d 584, 597 n.25 (8th Cir. 1976):
 
 
 36
 A court does not depart from its proper function when it undertakes a study of the record, hopefully perceptive, even as to the evidence on technical and specialized matters, for this enables the court to penetrate to the underlying decisions of the agency, to satisfy itself that the agency has exercised a reasoned discretion, with reasons that do not deviate from or ignore the ascertainable legislative intent. 'The deference owed to an expert tribunal cannot be allowed to slip into a judicial inertia.' Volkswagenwerk Aktiengellschaft (Aktiengesellschaft) v. FMC, 390 U.S. 261, 272, 88 S.Ct. 929, 935, 19 L.Ed.2d 1090 * * * (1968).
 
 
 37
 We have carefully considered the record before us in the light of the principles just stated. While we question the substantiality of many of the complaints made by the petitioners about the approach that the Commission took with respect to the problem before it, we are troubled by some of the language appearing in the agency opinions.
 
 
 38
 At page 44 of the opinion of the Review Board, the Board, after rejecting the carriers' argument that the reasonableness of the differentiated rates had been established by the holding of the Commission in No. 35527, Wheat, Minnesota, Montana, North Dakota & South Dakota to Minnesota and Wisconsin (1974), went on to say that since those rates had been in effect and were moving the traffic, they were "presumptively within the zone of reasonableness."
 
 
 39
 It is true, of course, that a rate which has actually gone into effect and which is moving traffic is presumably reasonable and valid in the sense that if it is attacked in a § 15(1) proceeding, the burden of proving unreasonableness is upon the party who asserts it. And that may have been all that the Board really meant to say. The Board knew, of course, and the Commission knew that this was a § 15(7) proceeding and that the burden of proof was on the carriers.
 
 
 40
 We would not agree with a bald statement that the fact that a rate has gone into effect and is moving traffic necessarily requires or justifies a factual inference that the rate is reasonable. That would depend upon a number of factors including competitive conditions and choices open to shippers. If a farmer or elevator operator has grain on his hands that has to be moved, and if he has no choice in the matter of carriers, he is going to pay the prescribed rate regardless of its reasonableness or go out of business. And one of the reasons why the Interstate Commerce Act was passed in the first place was to protect shippers from carrier exploitation in the matter of rates and charges.
 
 
 41
 While we note the Commission's reference to the policy expressed in § 202(d) of the 1976 statute, we question whether the Commission's decision ultimately is bottomed on that policy and we think that what the Commission had to say about the necessity of permitting carriers to rescind or amend "innovative rates" if the reasons for the establishment of those rates disappear[5] needs to be qualified to some extent.
 
 
 42
 Undoubtedly the Commission acted appropriately in holding that the national transportation policy encourages "innovative" rates based on seasonal or peak period demands for rail service, and that the establishment of such rates by carriers should not be discouraged by binding the carrier too tightly to them even though circumstances may change. Nevertheless the response of a carrier to changing circumstances must itself be reasonable, and a return to former rates is not justified if those rates themselves are unreasonable. And we doubt that the Commission intended to express a contrary view.
 
 
 43
 In spite of our difficulties with some of the language of the Review Board and of the Commission, we would probably be able to go along with the agency if the original reduction in rates, including the reductions brought about by the seasonal variations, had not been accompanied by reductions in service, or if the carriers in eliminating the seasonal differentials in rates had been willing to restore services that had been eliminated or curtailed in connection with the establishment of the differentials in the first instance.
 
 
 44
 However, it is one thing to permit a carrier to reduce a rate without any reduction in service and then restore the rate when the economic reason for the reduction has ceased to exist, or to permit the carrier to reduce a rate with an offsetting reduction in service and then to restore both the original rate and the original service on the basis of changed circumstances. It is quite another thing to say that the carrier may cut both rate and service and then restore the rate without restoring the service simply because the reduction has ceased to serve any useful purpose. We think that in that situation it is incumbent upon the carrier in a § 15(7) proceeding to justify the fact that it is raising rates but not restoring services.
 
 
 45
 The Commission was obviously aware that in connection with the establishment of the seasonal differentials in rates services had been cut and that the carriers were not proposing to restore those services in connection with the elimination of the differentials. However, in our estimation neither the opinion of the Review Board nor that of Division 2 of the Commission came to grips with that problem, and we cannot be sure that it was given proper consideration.
 
 
 46
 Accordingly, we hold that the order of the Commission should be vacated, and the case remanded to the Commission for further consideration of the problem above outlined and for more specific findings dealing with the failure of the carriers to restore, in whole or at least in part, the services in question. In the course of the remand the Commission may find it necessary or desirable to reopen the record for the reception of additional evidence, and in its reconsideration the Commission is not required to limit its inquiries to the specific problem that has occasioned the remand.
 
 
 47
 Vacated and remanded for further proceedings.
 
 
 
 [1]
 The Commission's order was entered after hearing pursuant to § 15(7) of the Interstate Commerce Act, 49 U.S.C. § 15(7), as it was written prior to the adoption by Congress in 1976 of the Railroad Revitalization and Regulatory Reform Act of 1976, P.L. 94-210, 90 Stat. 31 et seq. Generally speaking, the ground covered by original § 15(7) is now covered by § 202(c), (e)(2) of the 1976 statute, 49 U.S.C., 1977 Cum.Supp., § 15(8). The 1976 statute is sometimes called the "4 R" statute
 
 
 [2]
 We note that this point that where a shipper challenges a rate that has already gone into effect in a proceeding under § 15(7) of the Act, the burden is on the shipper to establish that the rate is unjust or unreasonable. Atchison, Topeka & Santa Fe Ry. v. Wichita Board of Trade, 412 U.S. 800, 812-13, 93 S.Ct. 2367, 37 L.Ed.2d 350 (1973); Central of Georgia R. R. v. United States, 379 F.Supp. 976 (D.D.C.1974), aff'd without opinion, 421 U.S. 957, 95 S.Ct. 1944, 44 L.Ed.2d 446 (1975)
 
 
 [3]
 The original rates plus intervening increases prior to 1960 are at times referred to as "No. 17,000" rates. The reference is to I.C.C. Docket No. 17,000, Part VII, Grain and Grain Products, 164 I.C.C. 619 (1930), and 205 I.C.C. 301 (1934). As stated, those rates were "full service" rates. As of 1974, barley was regularly moving under those rates, but wheat rarely moved under them. Other grains were moving under the old rates only during summer months and from certain particular stations with respect to which lower rates had not been offered by the carriers due to an absence of truck competition
 
 
 [4]
 A "zone of reasonableness" exists where the circumstances are such that any one of several rates would be reasonable; in that situation the carrier is ordinarily free to select a particular rate within the zone. See Central of Georgia R. R. v. United States, supra, n. 2, 379 F.Supp. at 979
 
 
 [5]
 Somewhat similar language appears in the opinion of the Review Board