641 F.2d 1220
 CITY OF CHEROKEE, Rock Rapids Community Affairs Corporation,
Farmer's Co-Op, Archer Co-Op, Calumet Feed Service, K-F
Motors, Metz Baking Company, Ray Halder AGG Lime Service,
Rowena Elevator & Mill, L. C. Burkhalter and M. S. Stuckey,
Petitioners,
v.
INTERSTATE COMMERCE COMMISSION and United States of America,
Respondents,
and
Illinois Central Gulf Railroad Company, Intervenor-Respondent.
 No. 80-1185.
 United States Court of Appeals,
Eighth Circuit.
 Submitted Oct. 15, 1980.
Decided Feb. 12, 1981.
Rehearing Denied March 17, 1981.
Rehearing and Rehearing En Banc Denied April 9, 1981.
 
 Marvin Wallace Miller, City Sol., Cherokee, Iowa, Gordon P. MacDougall, Washington, D. C., for petitioners.
 Charles E. Dapron, John P. Emde, Armstrong, Teasdale, Kramer & Vaughan, St. Louis, Mo., John H. Doeringer, Chicago, Ill., for intervenor-respondent Illinois Central Gulf Railroad Co.
 Sanford M. Litvack, Asst. Atty. Gen., John J. Powers, III, Chief, Appellate Section, Susan J. Atkinson, Atty., Appellate Section, Antitrust Div., Dept. of Justice, Washington, D. C., Richard A. Allen, Gen. Counsel, Henri F. Rush, Associate Gen. Counsel, Joseph H. Dettmar, Atty., I.C.C., Washington, D. C., for respondents.
 Before HEANEY, ADAMS* and STEPHENSON, Circuit Judges.
 HEANEY, Circuit Judge.
 
 
 1
 On February 2, 1980, the Interstate Commerce Commission (Commission) rejected the recommendation of its Administrative Law Judge and authorized the Illinois Central Gulf Railroad Company (ICG) to abandon over 96 miles of track between Cherokee, Iowa, and Sioux Falls, South Dakota the Sioux Falls District line. After a thorough review of the record, we find that the Commission failed to evaluate ICG's application for abandonment pursuant to the proper statutory standards. Specifically, we hold that the Commission erred by failing to properly balance the competing benefits and burdens of all interested parties, as it was required to do by statute. We also determine that the Commission erred in failing to treat certain train crew wages as "unavoidable costs" when it made its economic computations. We reverse the order of the ICC and remand the case to the Commission to reconsider its earlier order.
 
 
 2
 * ICG is a land grant railroad with main lines between Chicago and the Gulf of Mexico. ICG was founded 130 years ago; in 1888, it purchased the Sioux Falls District line from another railroad. In 1962, ICG formed I. C. Industries to acquire, develop and control non-rail business. In 1968, I. C. Industries embarked on a course of substantial diversification which resulted in the formation of five discrete groups: commercial products, consumer products, real estate, financial and transportation. Today, ICG is the wholly owned subsidiary of I. C. Industries.
 
 
 3
 By 1977, I. C. Industries reported record sales and earnings with a net income of nearly $79 million. Although the transportation group produced thirty-six percent of the revenues of I. C. Industries, only four percent of its pretax income was attributable to this group. On the other hand, the commercial and consumer groups contributed seventy-seven percent of I. C. Industries' pretax income, marketing such products as Pepsi-Cola, Bubble Up, Dad's Root Beer and Midas Mufflers. I. C. Industries has indicated that these consumer products are becoming the foundation of the long range structure of the conglomerate. Recently, I. C. Industries revealed to its stockholders that, in all likelihood, ICG will be merged or sold at some future date.
 
 
 4
 The Sioux Falls District line has been used in the past to transport light loading traffic, primarily merchandise shipped in trailers on flat cars ("piggyback traffic") and fresh meat. However, no fresh meat has been transported over the line since December 10, 1977. On that date, ICG received an effective cancellation of its tariff on fresh meat moved in its refrigerated trailers. Less than three weeks later, it filed an application for abandonment.
 
 
 5
 In 1977, prior to cancelling its fresh meat tariff, ICG moved approximately 30,000 tons of meat traffic. The record indicates that in that year, ICG's largest fresh meat shipper was slowed by a labor strike. The record also indicates that ICG's refrigerated meat cars needed repair or replacement at the time the tariff was cancelled. Grain has been moved on the line in recent years but not in substantial amounts. Some small grain shippers have indicated that they foresee an increasing need for ICG's smaller grain cars.
 
 
 6
 The Sioux Falls District line has historically been a high speed line, with a maximum freight train speed of 40 m. p. h. for most of its distance, with the exception of a stretch slowed to 30 m. p. h. There is no present need to rehabilitate the track of the Sioux Falls District line. It appears, however, that two bridges along the line will need repair and that the cost of such repair will be approximately $121,540.
 
 II
 The Initial Decision of the ALJ
 
 7
 ICG filed its application for abandonment on December 27, 1977, and the case was assigned to Administrative Law Judge Isabelle R. Cappello for hearing. The ALJ conducted hearings in May and October, 1978. After a careful review of the entire record, she issued her well reasoned opinion denying ICG's application. Recognizing that under the current law the railroad had the burden of establishing that the "present or future public convenience and necessity" required the abandonment of the line, the ALJ ruled that the applicant-railroad had failed to meet this burden. See 49 U.S.C. § 10904(b) (Supp. II 1978).
 
 
 8
 In reaching this conclusion, the ALJ weighed the competing benefits and burdens that would ultimately result from abandonment. In essence, she compared the burden that continued operation would impose on the carrier with the adverse effects that abandonment would level upon the shippers and local communities who depend upon the continued operation of the line. See Chicago & Eastern Illinois R. Co. Abandonment, 354 I.C.C. 789, 795 (1978). She rested her opinion on four major points: (1) the line was making a positive contribution to ICG; (2) the carrier's benefit in reinvesting its capital in a more lucrative market was outweighed by the devastating effect abandonment would have on the community; (3) denying abandonment would secure environmental benefits to the affected communities; and (4) ICG made no commitment to funnel the monies it would realize upon abandonment back into ICG's other rail lines.
 
 
 9
 In assessing ICG's burden of continued operation, the ALJ properly followed the direction of the statute and the Commission's regulations, and compared the revenues attributable to the Sioux Falls District line with the "avoidable cost" of continued operation of the line. She determined that the revenues attributable to the line and the avoidable cost of operating the line for the years 1975-1977 were:
 
 
 10
 1975 1976 1977 (9 Mos.)
 ---------- ---------- ----------
Revenues $2,153,584 $1,734,875 $1,298,584
Costs $1,766,393 $1,490,341 $1,180,385
 ---------- ---------- ----------
Contribution $ 387,191 $ 244,534 $ 118,199
 
 
 11
 The ALJ arrived at these cost figures by deducting from ICG's overall cost of operation those sums attributable to the wages (including health & welfare and payroll tax additives) of the trainmen and train enginemen who run the Sioux Falls District line. The ALJ reasoned that since an enforceable collective bargaining agreement obligated ICG to continue to pay the wages of the Sioux Falls District's two crews indefinitely, regardless of whether the trains moved, this expense was not avoidable upon abandonment. She also deducted those sums attributable to property taxes, reasoning that unless and until the railroad received firm offers for its real estate holdings, it would continue to have to pay property taxes and, therefore, this cost would not be avoided upon abandonment.[1]
 
 
 12
 The ALJ stated that ICG's cancellation of its fresh meat tariff directly resulted in greatly diminishing traffic over the Sioux Falls District line; this suggested that ICG was artificially building a case for abandonment. Accordingly, she decided that any economic loss suffered by ICG, as a result of the cancellation of its fresh meat tariff, should not be included in the weighing formula.
 
 
 13
 Administrative Law Judge Cappello noted that the total liquidation value of the Sioux Falls District line was $6.1 million, and that even at a modest nine percent rate of return, ICG could recognize nearly $560,000 yearly on its investment base in the line. She determined that the real reason that ICG sought to abandon the Sioux Falls District line was so that it could divest itself of its holdings in the line and reinvest the realized sum in a more profitable enterprise. Because the carrier made no commitment to reinvest the monies in its other rail lines, she concluded that the benefit of the sale would never be shared by ICG's other rail lines or interstate commerce.
 
 
 14
 The ALJ considered rate of return on the investment base of the line as one side of the balancing process. She, however, weighed this cost to the carrier against the cost of abandoning an "irretrievable transportation corridor" to the communities and shippers that depend upon ICG's Sioux Falls District line. The ALJ noted that the burden to the affected communities would be significant and would, in fact, be shared with commerce generally. The ALJ's findings in this regard, supported by substantial evidence in the record, may be summarized as follows:
 
 
 15
 (1) Metz Bakery, South Dakota's largest commercial bakery, has a spur track that connects to the Sioux Falls District line. If the line were abandoned, Metz Bakery would need to convert its plant in order to receive flour by truck at a much inflated cost. This cost would, of course, be passed on to the consumer at the retail level.
 
 
 16
 (2) Jones Mill and Flour, a small elevator at Rowena, South Dakota, has consistently used small hopper cars on the Sioux Falls District line. If ICG were to abandon its line, it would result in Jones Mill and Flour shipping its grain by truck at an increased cost of twenty-nine cents per bushel for soybeans, twenty-three cents per bushel for corn and over seven cents per bushel for oats.
 
 
 17
 (3) Citizens of Cherokee, Iowa, opposed ICG's application for abandonment, arguing that it was the area's "last and best line." The other rail carriers that service points on the Sioux Falls District line and transport goods between Sioux Falls and Chicago are more circuitous. The CNW takes four days to make the trip, Burlington Northern three days, and the Milwaukee Road four to seven days. ICG provides overnight service to the same points. The ALJ also noted that the Milwaukee Road is in bankruptcy and that CNW's financial condition is precarious, at best. Furthermore, she stated that it was not wholly clear from the record whether any carrier other than ICG could handle the piggyback traffic that travels the Sioux Falls District line.
 
 
 18
 (4) Iowa citizens testified about their need for continued fertilizer shipments along the line proposed for abandonment. Shipping by truck would result in raising the price of fertilizer by.$7.00 per ton. One shipper testified that there is a serious shortage of trucks available for hauling fertilizer in the area. One Iowa fertilizer dealer, located on the Sioux Falls District line, Farmer's Co-Op, introduced testimony that it had just completed a 1,200-ton fertilizer storage structure. The Co-Op, which has 268 members, intended to fill the tank twice yearly; the structure's capacity is equivalent to twenty-four 50-ton railroad cars. The Co-Op views abandonment of the line as a disaster.
 
 
 19
 (5) Burt's Farm Service is a fertilizer and chemical supplier located on the Sioux Falls District line. No other rail carrier serves this shipper; nearby lines of CNW are in disrepair and cannot provide this shipper with assistance.
 
 
 20
 (6) Ray Halder runs an agricultural lime spreading business. He receives approximately fifty carloads of lime at Calumet from Fort Dodge, Iowa, over the Sioux Falls District line. Abandonment of the line would necessitate Halder's relocating at substantial expense.
 
 
 21
 (7) The Rock Rapids Community Affairs Corporation developed an industrial site on the Sioux Falls District line and paid for a rail spur. Since the community lost the Rock Island line by abandonment, continued operation of ICG's line would most likely attract industry to the site and increase ICG's revenues as the only available rail carrier.
 
 
 22
 In the end, the ALJ determined that the scales tipped in favor of those who protested the abandonment. While it would be in ICG's economic interest to reinvest its capital in some more lucrative market, she concluded, "it would not be in the public interest to sacrifice an irretrievable transportation corridor to such businesses as I. C. Industries currently plans for its structure."[2] Accordingly, she issued an order denying the railroad's application for abandonment.
 
 The Commission's Decisions
 
 23
 An administrative appeal was taken from the decision of the ALJ to Division 1 of the Commission. The panel essentially adopted the ALJ's factual findings but arrived at a contrary conclusion, thus reversing the order of the ALJ and granting the abandonment. The rationale of the panel rested, basically, upon its determination that labor costs and property taxes are avoidable costs as a matter of law. The panel ruled that the Commission had neither the expertise nor the responsibility to interpret private labor-management agreements. The panel further stated: "(n)or can the existence of such a private agreement operate to effect Commission consideration and determination of questions of public convenience and necessity."[3] The panel ruled that property taxes were avoidable costs upon abandonment, even though ICG had received no firm offers for its real estate holdings, because it could be assumed that ICG would divest itself of these holdings within a reasonably short period of time.
 
 
 24
 In addition, the panel rejected the ALJ's conclusion that ICG could recapture its meat traffic and increase its grain traffic, stating that such a conclusion was speculative and not supported by the record. It agreed that abandonment would cause some adverse environmental effects, but held that these were not sufficient to offset the economic benefits that would accrue to ICG and interstate commerce through abandonment. Finally, the panel dismissed, without visible analysis, the ALJ's findings regarding abandonment's burdens on the community.
 
 
 25
 The protestants petitioned for administrative review of the decision of the Commission, Division 1. The petition was granted and the Commission affirmed the panel's decision. The full Commission, adopting the rationale of the panel, determined that: (1) the interpretation of a private agreement was not within the scope of the ICC's expertise or responsibility; (2) a private agreement could not control the Commission's determinations regarding public convenience and necessity; and (3) in assessing an application for abandonment, the Commission must compare the revenues attributable to the line with the cost of operating the line as a going concern. In this way, any and all costs of operating the line even those that could not be avoided upon abandonment would be compared to the revenues attributable to the line. Furthermore, the Commission redefined the term "avoidable cost" as joint cost, i. e., a cost borne in part by another revenue-raising entity. The Commission reasoned that since the Sioux Falls District line was the only affected revenue-raising entity, all the costs of operation had to be attributed to the line proposed for abandonment and no other. Therefore, since another revenue-raising entity was not available to incur a portion of the costs of operation, there were no unavoidable costs. Accordingly, after adjusting the three years' data available, the Commission determined that ICG's Sioux Falls District line was not realizing a profit and authorized abandonment.
 
 III
 
 26
 We begin by noting that the scope of our review of an order of the Interstate Commerce Commission is narrow. North Dakota State Wheat Comm'n v. United States, 565 F.2d 621, 626 (8th Cir. 1977). Nevertheless, we are required to thoroughly review the entire record and carefully examine the Commission's conclusions to determine whether its findings are supported by substantial evidence in the record as a whole, and whether proper legal standards were correctly applied. See Citizens to Preserve Overton Park, Inc. v. Volpe, 401 U.S. 402, 415-416, 91 S.Ct. 814, 823, 28 L.Ed.2d 136 (1971); Burlington Northern, Inc. v. United States, 549 F.2d 83, 88 (8th Cir. 1977). We note that
 
 
 27
 (a) court does not depart from its proper function when it undertakes a study of the record, hopefully perceptive, even as to the evidence on technical and specialized matters, for this enables the court to penetrate to the underlying decisions of the agency, to satisfy itself that the agency has exercised a reasoned discretion, with reasons that do not deviate from or ignore the ascertainable legislative intent. "The deference owed to an expert tribunal cannot be allowed to slip into a judicial inertia." Volkswagenwerk Aktiengesellschaft v. FMC, 390 U.S. 261, 272, 88 S.Ct. 929, 935-936, 19 L.Ed.2d 1090 (1968).
 
 
 28
 Greater Boston Television Corp. v. F.C.C., 444 F.2d 841, 850 (D.C.Cir.1970) (footnote omitted), cert. denied, 403 U.S. 923, 91 S.Ct. 2229, 29 L.Ed.2d 701 (1971). See North Dakota State Wheat Comm'n v. United States, supra, 565 F.2d at 627; Burlington Northern, Inc. v. United States, supra, 549 F.2d at 88-89. See also Environmental Defense Fund, Inc. v. Ruckelshaus, 439 F.2d 584, 597 (D.C.Cir.1971). See generally B. Schwartz, Administrative Law § 204 (1976).[4]
 
 IV
 
 29
 The two dispositive questions raised in this case are whether the Commission correctly included train and engine crew wages as "avoidable costs" in granting ICG's application for abandonment, and whether the Commission properly balanced the interests of the carrier and the affected communities before it authorized abandonment.[5]
 
 
 30
 Section 1(18) of the Interstate Commerce Act, amended as § 1a and recodified as 49 U.S.C. §§ 10903-10905 (Supp. II 1978)[6] controls this case. The statute provides in relevant part:
 
 
 31
 A rail carrier providing transportation subject to the jurisdiction of the Interstate Commerce Commission * * * may (1) abandon any part of its railroad lines * * * only if the Commission finds that the present or future public convenience and necessity require or permit the abandonment or discontinuance. In making the finding, the Commission shall consider whether the abandonment or discontinuance will have a serious, adverse impact on rural and community development.
 
 
 32
 49 U.S.C. § 10903(a) (Supp. II 1978).
 
 
 33
 The Act demands that the Commission, in determining the present or future public convenience and necessity, balance the benefits and burdens of abandonment which are ultimately distributed between the carrier, the protestant communities and shippers, and interstate commerce generally. In Colorado v. United States, 271 U.S. 153, 46 S.Ct. 452, 70 L.Ed. 878 (1926), the Supreme Court established the basic outline of the statutory scheme:
 
 
 34
 The sole test prescribed is that abandonment be consistent with public necessity and convenience. In determining whether it is, the Commission must have regard to the needs of both intrastate and interstate commerce. For it was a purpose of Transportation Act, 1920, to establish and maintain adequate service for both. The benefit to one of the abandonment must be weighed against the inconvenience and loss to which the other will thereby be subjected. Conversely, the benefits to particular communities and commerce of continued operation must be weighed against the burden thereby imposed upon other commerce.
 
 
 35
 Id. at 168, 46 S.Ct. at 456 (citations omitted); Missouri Pacific R. Co. v. United States, 625 F.2d 178, 180 (8th Cir. 1980). See also Chicago & N. W. Transp. Co. Abandonment, 360 I.C.C. 647, 651 (1980); Seaboard Coastline R. Co. Abandonment, 360 I.C.C. 257, 259 (1979).
 
 
 36
 In November, 1976, the Commission issued its regulations governing abandonment proceedings. The regulations set forth the basic procedural guidelines for abandonment proceedings. See Abandonment of Railroad Lines and Discontinuance of Service, Ex Parte 274 (Sub. No. 2), 354 I.C.C. 251 (1976) (hereinafter 49 C.F.R. § 1121 et seq. (1979)). In addition to carrying the burden of proving that abandonment is in the public interest, the regulations require the carrier to satisfy a lengthy set of procedural prerequisites. They also require the carrier to present specific and accurate cost/revenue data. The Commission uses this data to compare the revenues attributable to the line with the avoidable cost of operating the line, mindful that the carrier should recognize a reasonable rate of return on the value of its line. See Texas & Pac. Ry. Co. Abandonment, 360 I.C.C. 31, 35-36 (1978); 49 C.F.R. §§ 1121.40-47 (1979). See generally Johnson, The Railroad Revitalization and Regulatory Reform Act of 1976, 45 I.C.C. Practitioner's J. 35-47 (1977).
 
 V
 
 37
 1. The train crew wages are not avoidable costs.
 
 
 38
 ICG presented to the ALJ the cost/revenue data required by the regulations. All parties agree that the ALJ's financial data is accurate; the dispute is whether certain crew wages were permissibly deducted from the "costs" side of the formula as "unavoidable." As noted, the ALJ reasoned that, on the basis of the record before her, the wages of two train crews would have to be paid indefinitely as a result of a collective bargaining agreement between ICG and the crew's statutory bargaining representative, regardless of whether the Sioux Falls District line were abandoned.[7] Applying the statutory definition of "avoidable cost" "all expenses that would be incurred by a rail carrier in providing transportation that would not be incurred if the railroad line over which the transportation was provided were abandoned * * *." 49 U.S.C. § 10905(a)(1) (Supp. II 1978) she concluded that the crew's wages could not be considered "avoidable." After making the proper adjustments, she discovered that the line was making a positive contribution to ICG (i. e., the branch's revenues exceeded its cost of operation).
 
 
 39
 In reversing the decision of the ALJ, the Commission reasoned that the line had to be viewed as a going concern and that as such it would be irrational not to consider wages as one of the costs of operating the line. The Commission further stated that the concept of an avoidable cost is appropriate only when the carrier's costs are shared between two or more revenue-producing operations. The Commission explained that when one of the line's operations is abandoned and the other continues, then the cost of the continued operation is "unavoidable" and may not be treated as a cost in the revenue-cost formula. It concluded there were no joint costs in this case and, therefore, all costs were avoidable upon abandonment. The Commission erred in so holding.
 
 
 40
 Avoidable cost is related to the concept of incremental cost. The two terms are distinguishable in that the former is usually applied to retractions in service. Consider the following example:
 
 
 41
 Suppose a railroad has just been faced with the proposition of discontinuing a service which obligates it to spend $100 next year and $200 two years from now, but if service were discontinued, its obligation would be $25 per year. The avoidable cost would then be the present value of $75 ($100-$25) discounted one year plus $175 ($200-$25) discounted for two years.
 
 
 42
 Price & Berardino, Defining Economic Terms Used in the Railroad Revitalization and Regulatory Reform Act, 9 Transp.L.J. 133, 154 (1977).
 
 
 43
 In purely economic terms, avoidable costs are an empirical measure of marginal costs that decrease through reductions or cessations in output. In the industry, avoidable costs are related to "cash outlays that occur through time." Price & Berardino, supra, at 155. In this way, avoidable costs are like cash flow statements that reflect cash changes attributable to the elimination of an asset or a particular service. Id. Accordingly, by definition, "(a)voidable costs are equal to the savings in resources due to the elimination of a particular activity." Id. at 156.
 
 
 44
 We feel the Commission was obliged to make its economic computations using the terms defined by Congress as its guide. It was not authorized to redefine the term "avoidable cost" as synonomous with "joint cost," and end its discussion there. If the Commission had used the statutory definition of avoidable cost, it would have concluded, as the ALJ properly did, that the wage costs must not be considered avoidable upon the elimination of the Sioux Falls District line.
 
 
 45
 2. The Commission failed to properly weigh the competing burdens/benefits of both the carrier and the affected communities.
 
 
 46
 The ALJ recognized that if the line were abandoned and all the properties sold, the money thereby realized could be invested in a more lucrative market, and ICG would realize a significant return on its capital investment in the Sioux Falls District line. She did not believe, however, that this factor should necessarily be determinative of the entire case. She correctly reasoned that Congress intended this factor to be measured against the burden that abandonment would impose on the affected communities and shippers. 49 U.S.C. §§ 10903-10905 (Supp. II 1978). The Commission stated in substance that if the carrier could not operate the branch line as a profitable going concern (and if it could turn a greater profit through abandoning the line and selling its property holdings), then abandonment would be permissible.
 
 
 47
 The ALJ was right and the Commission was wrong. Congress did not intend for the Commission to authorize abandonment of particular rail lines solely because the carrier's capital investment in the line could be more profitably put to work elsewhere. Congress intended that the Commission determine the degree and severity of the benefits and burdens which abandonment would occasion to all affected parties. The Commission does not have the authority to modify the measuring mechanism mandated by Congress.
 
 
 48
 Although we think the ALJ correctly complied with the statute and properly balanced the competing interests of all affected parties, we cannot be called upon to affirm her decision on the basis of our independent review of the record. We have no alternative here but to remand this case to the Commission with directions to properly balance the benefits and burdens that would inure to both the carrier and the communities upon either abandonment or forced continued operation of the line. We further direct the Commission to articulate, with precision, its conclusions in this regard and issue an order that is capable of proper review by this Court.[8]
 
 
 49
 ADAMS, Circuit Judge, dissenting.
 
 
 50
 Although I share the majority's concern for the Iowa-South Dakota region whose economic future is clouded by proposed railroad abandonments, I nevertheless find myself compelled to dissent. For today's opinion rests on what I perceive to be an intrusion by the judiciary into an administrative agency's realm of expertise and policymaking, as well as a misunderstanding of the agency's economic analysis of the proposed abandonments.
 
 
 51
 I part company from three aspects of the majority opinion: (1) the scope of review, not as articulated, but as actually engaged in; (2) the definition and application of the statutory term "avoidable costs"; (3) and the propriety of our addressing an issue that was not raised by the parties.
 
 
 52
 While I agree with the majority's statement that the scope of our review of an order of the Interstate Commerce Commission (the Commission), is limited to a determination whether the Commission's findings and conclusions are supported by substantial evidence on the record as a whole, Illinois Central R.R. Co. v. Norfolk & Western Ry. Co., 385 U.S. 57, 87 S.Ct. 255, 17 L.Ed.2d 162 (1966); 5 U.S.C. § 706(2)(E) (1976), the majority appears to have transgressed this acknowledged restriction. As this Court recognized in one of the first cases to be reviewed under the recent legislation permitting petitions from agency orders to the court of appeals:[1]
 
 
 53
 In this circuit a petition for review of a Commission's order will be denied on a summary basis when the order is based on the evidence and supported by a rational judgment of the Commission .... It is rare that a Commission order is not based on relevant factors or that the exercise of its expertise can be termed such an abuse of discretion as to require reversal by the courts. That such limited review was the intent of Congress is clear.
 
 
 54
 Warren Transport Inc. v. United States, 525 F.2d 148, 151 (8th Cir. 1975).
 
 
 55
 Such a posture balances the responsibility to avoid judicial overreaching into areas of discretion and of policy choices that are vested by Congress in the Commission, with our primary duty to review agency decisions so as to ensure conformity with pertinent legal requirements.
 
 
 56
 It is not, however, within our province to choose between discrepant decisions by the ALJ and the Commission, nor, as the majority seems to suggest, to alter our level of review because the two decisions are contradictory. See maj. op. at n.4. The Commission is in no sense bound by the ALJ's decision. In fact, scrutiny of the ALJ's actions is only incidental to our review of the Commission's decisions, see 28 U.S.C. §§ 2321, 2342, 2344. Except on matters of credibility, which are not in issue here, the ALJ's conclusion is to be accorded little deference provided the Commission has made an independent evaluation supported by substantial evidence. Thus, as the First Circuit noted in an analogous context, "the question before us is not whether the ALJ's approach was, in our view, better, but simply whether the Commission's method of computing the extent of the carriers' injury was rational." Bangor & A. R. Co. v. I. C. C., 574 F.2d 1096, 1110 (1st Cir. 1978), cert. denied, 439 U.S. 837, 99 S.Ct. 121, 58 L.Ed.2d 133.[2] The majority's proclivity to weigh the desirability or correctness of the ALJ's decision against that of the full Commission, accordingly, would appear to be unauthorized.
 
 
 57
 Secondly, I differ from the conception of avoidable costs that is developed in the majority opinion. Contrary to the majority's belief that "(t)he Commission further stated that the concept of an avoidable cost is appropriate only when the carriers' costs are shared between two or more revenue-producing operations," ante at 1229, I read the full Commission's decision to state exactly the opposite that it is precisely when no shared or joint costs exist that avoidable costs are present. Conversely, when joint costs do exist many costs are not avoidable, for the elimination of one operation would leave unaffected the need to continue those costs to support the remaining operation. As the Commission declared, "every ongoing-out-of-pocket cost of a particular rail operation, that cannot be properly reallocated to any other revenue-producing operation (i. e. is not a shared or joint cost) must be considered as part of the cost of the operation proposed for abandonment." 363 I.C.C. at 96. Rather than being synonymous with joint costs, as the majority contends, ante at 1229, avoidable costs are defined in opposition to joint costs.
 
 
 58
 The consequences of my disagreement with the majority on this issue are twofold. Initially, I do not believe that the Commission deviated from the statutory definition of avoidable cost. Cf. maj. op. at 1229. As the majority indicates, the recent Railroad Revitalization and Regulatory Reform Act (4-R Act) Pub.L. No. 94-210, 90 Stat. 31 (1976), now codified at 49 U.S.C. § 10903-10905 (Supp. II 1978), provides the governing law for abandonment of rail lines. Section 10905(a) defines "avoidable cost":
 
 
 59
 (1) "avoidable cost" means all expenses that would be incurred by a rail carrier in providing transportation that would not be incurred if the railroad line over which the transportation was provided were abandoned or if the transportation were discontinued. Expenses include cash inflows foregone and cash outflows incurred by the rail carrier as a result of not abandoning or discontinuing the transportation. Cash inflows foregone and cash outflows incurred include
 
 
 60
 (A) working capital and required capital expenditure;
 
 
 61
 (B) expenditures to eliminate deferred maintenance;
 
 
 62
 (C) the current cost of freight cars, locomotives, and other equipment; and(D) the foregone tax benefits from not retiring properties from rail service and other effects of applicable Federal and State income taxes.
 
 
 63
 The Commission's definition of avoidable costs properly reflects the congressional meaning. Instead of parroting the statutory language the Commission, admittedly, spoke of ongoing out-of-pocket costs rather than "outflow incurred." But this did not distort the statutory definition. Nor did the illustration of joint costs do more than illuminate why avoidable costs become problematic in areas of overlapping operations. In fact, the Commission's finding that it "would allow as an avoidable cost ... only those costs which it was shown would not have to be continued (to support some other service)," 363 I.C.C. at 96, is clearly consonant with the statutory language.
 
 
 64
 Further, based on the record before us and in light of my view that the Commission rationally interpreted the meaning of the term avoidable costs, I conclude that the Commission did not err in holding the crew's wages avoidable upon abandonment. Cf. maj. op. at 1229. All the parties concede that Commission regulation 49 C.F.R. 1121.42 expressly contemplates engine and train crew wages to be avoidable costs so long as they "are incurred solely as a result of the continuation of rail freight service on the branch." The union and petitioners, however, maintain that their wages are not incurred solely on account of continued service. They argue that under the collective bargaining agreement the "tabulated local rule" the ICG is compelled to pay their wages indefinitely, regardless of whether the rail line exists or is abandoned.
 
 
 65
 Bearing in mind that our review focuses on whether there is a rational basis for the Commission's conclusion, not whether petitioners and the ALJ's position might also be plausible, I do not find the Commission's analysis of the situation unsupported by the record. The Commission reasoned that the wages were an existing cost:
 
 
 66
 Thus, even if it were clearly established that ICG would have to continue the wages of these two train crews for some period of time after shutting down operations ... it still would not follow that their wages and fringe benefits should be left out of account in assessing the burden on ICG and on interstate commerce of requiring ICG to continue operations on the line.
 
 
 67
 363 I.C.C. at 97.
 
 
 68
 Next, the Commission noted that although the wages might have to be treated temporarily as deferred costs of the abandoned operation, such costs gradually would be eliminated. From the Commission's perspective, no one could contend "that (trainmen) will continue indefinitely to be paid for doing nothing. At most it will be until the local (labor) agreement is next renegotiated, or in the extreme imaginable case until these workers reach retirement age. Under even the most ironclad attrition agreement, attrition eventually takes place." 363 I.C.C. at 98 n.5. The final element in the Commission's determination that the wages were avoidable costs involved a policy choice. Underlying its assessment "that it would be improper to use the prospective imposition of labor protective provisions as an argument for ignoring present labor costs when considering the abandonment of a branch line," as the ALJ did, was the recognition that the consequent contorting of the profitability calculation would ultimately discourage such private agreements. That is, if attrition agreements or "tabulated local rules" were viewed as immutable and eternal, they would function to prevent adjustments in rail operations needed to reflect changed public demand as well as to keep railroads out of reorganization proceedings. The public interest would suffer and the objective of protecting labor would eventually boomerang for carriers would refuse to enter such unrealistic arrangements.
 
 
 69
 On the record, the Commission's decision to treat crew costs as avoidable is supported by substantial evidence. The regulations define such costs as avoidable; the effect of the collective agreement was in question;[3] and the Commission's policy choice seeking to balance the goal of stable employment with that of viable railroads, rather than sacrifice the latter to the former was clearly within the realm of its expertise. There would appear to be nothing arbitrary in the Commission's reasoning that the possible existence of deferred wage costs is neither a valid basis for denying abandonment nor a ground for defining an otherwise unprofitable operation as profitable.
 
 
 70
 Moreover, I have difficulty understanding how the decision by the majority to uphold the Commission's determination that property taxes are avoidable costs, see maj. op. at 1227 n.5, may be reconciled with its decision to reject the Commission's complementary finding that wage costs are avoidable. As with crewmen's wages, the abandonment regulations specifically recognize real property taxes as avoidable costs. Again, the Commission adhered to the congressional definition of avoidable cost: "A cost is avoidable if it can with reasonable certainty be avoided within a reasonable time following abandonment." 363 I.C.C. at 100. And the Commission made explicit that "(t) he principles underlying our earlier discussion of avoidable wage costs are applicable here as well." 363 I.C.C. at 100. It is unclear how the Court can find identical principles and analysis permissible at another point, with respects to taxes and irrational at another, with respects to wages. Insofar as the Court has failed to distinguish why the Commission's reasoning is appropriate for property taxes but not for wage costs, the agency will, in the absence of further explication, have difficulty on remand fulfilling the mandate "to articulate, with precision" the analysis underpinning its next determination.
 
 
 71
 As indicated above, I diverge from the majority on a third matter: the propriety of raising sua sponte an issue not addressed by the parties. My reluctance to expand judicial oversight is in this instance both informed by the statutory limitations on our scope of review and enhanced by the prospect of penalizing the Commission for properly limiting its response to the sole issue raised by petitioners. As the Commission itself noted, "although (our) determination that the public convenience and necessity permit the abandonment was based upon weighing and valuing a number of factors, petitioners have limited their challenge to the Commission's decision to a single item with respect to the cost side of the equation. Accordingly, we shall limit our defense of the Commission decision to that issue." (R. Brief at 12). Thus, concerns of both an institutional and of a due process nature heighten my disagreement, at the factual level, with the majority's holding that "the Commission failed to properly weigh the competing burdens/benefits of both the carrier and the affected communities." Ante at 1229.
 
 
 72
 Insofar as fulfillment of our obligation to review thoroughly the record as a whole,[4] has led the Court to hold that the Commission did not adequately consider the benefits and burdens of abandonment to the community, an objective perusal of the entire record indicates that the Commission properly performed the statutory balancing act. It is undisputed that "whether the abandonment or discontinuance will have a serious, adverse impact on rural and community development" is an essential ingredient of the statutory touchstone whether "the present or future public convenience and necessity require or permit abandonment." 49 U.S.C. § 10903(a)(2). At a minimum, the Commission considered the impact on the community at two points in its order.
 
 
 73
 With respect to the future need for refrigerated meat service, the Commission affirmed the panel's conclusion that the ALJ's assumption about the recoverability of meat traffic was speculative and unrealistic. In doing so, the Commission relied on the inference that the present decline in demand for refrigerated services is likely to continue, and further noted that no testimony of need was offered by a shipper or prospective shipper. The Commission acknowledged that testimony of a demand for services would be highly probative but regarded the silence in the present proceeding as a reflection of minimal local need. Clearly, the impact on the community was an element in the determination. 363 I.C.C. at 102-03.
 
 
 74
 The Commission then stated that, "we see no basis for disturbing the panel's ultimate weighing of the factors of public convenience and necessity, which led it to conclude that abandonment should be permitted." This indicates an adoption of the panel's calculus which found that the adverse environmental factors enumerated by the ALJ (small increase in fuel consumption, noise and air pollution) and the economic burdens which abandonment would impose upon shippers and community development were collectively insufficient to offset the economic advantages to ICG and to interstate commerce which would result from an authorization of abandonment. When the panel's determination is combined with the environmental threshold assessment survey[5] adopted by the panel (and which found no negative impact on industrial development), the record evinces substantial evidence, notwithstanding the ALJ's conclusion that abandonment seems more likely than not to have an adverse impact on rural development, to support the Commission.
 
 
 75
 Admittedly, the Commission's decision is grounded heavily on the effect that the abandonment or continuance would have on the economic well-being of the railroad. But this is not, as the majority hypothesizes, because the Commission believed "in substance that if the carrier could not operate the branch as a going concern ... then abandonment would be permissible." Ante at 1229. As the Commission explicitly stated, this assessment was only one of the concerns of the abandonment regulations. 363 I.C.C. at 96. The economic burden on the rail carrier was addressed extensively simply because the salient question whether crew wages were avoidable costs was inextricably linked to the economic balance sheet of the railroad. Once the Commission agreed with the panel that the ALJ's mischaracterization of wages and property taxes improperly transformed the 1976 and 1977 years' operating losses of $53,000 and $117,000 into profit contributions of $184,000 and $73,000, it had no need to go further. Rather than duplicate the panel's cost-benefit balancing it was permissible for the Commission to adopt the panel's weighing of the relevant statutory factors. Only if the Commission had disagreed with the panel would there have been a need for a reworking of the benefit/burden calculation. In the present proceeding, there is no justification for a remand.
 
 
 76
 While either a wholehearted commitment to the economic viability of railroads or a more integrated approach to areas threatened by multiple abandonments might be preferable, and might eliminate many of the problems implicit in this appeal, at present it is necessary to work within existing statutory definitions and a circumscribed scope of review that have been ordained by the Congress. Because I believe the majority trenches upon agency discretion and fails to grasp the appropriate relationship between avoidable and joint costs, and because I find substantial evidence to support both the panel's and the full Commission's assessment of avoidable costs and public convenience, I respectfully dissent.
 
 
 
 *
 The HONORABLE ARLIN M. ADAMS, United States Circuit Judge for the Third Circuit Court of Appeals, sitting by designation
 
 
 [1]
 The deductions relative to wages were:
 1975 1976 1977 (9 Mos.)
-------- -------- --------
$191,237 $236,897 $189,430
The deductions relative to property taxes were:
 1975 1976 1977 (9 Mos.)
-------- -------- --------
$ 71,725 $ 60,678 $ 45,509
 
 
 [2]
 Neither the ALJ nor the Commission specifically addressed the question of opportunity costs. This case was tried to the ALJ and her order was entered (as was the panel's decision) well before the Commission issued its recent policy statement on the use of opportunity costs in abandonment proceedings. At the hearing before the ALJ, no evidence was offered or received on this issue. We are, therefore, not faced with the question raised in Missouri Pacific R. Co. v. United States, 625 F.2d 178 (8th Cir. 1980), in which an ALJ refused to permit a carrier to introduce evidence of opportunity costs. Since ICG chose not to produce evidence of opportunity costs below, it will not be allowed to do so now for the first time on appeal. We express no opinion on whether the Commission's policy statement concerning the use of opportunity costs in abandonment proceedings is inconsistent with the Commission's statutory authority or otherwise in conflict with the Interstate Commerce Act, 49 U.S.C. §§ 10903-10905 (Supp. II 1978)
 
 
 [3]
 In support of its position, the panel cited its own decision in Baton Rouge Bus Co. Abandonment, 275 I.C.C. 1 (1949), and also Burke County, Ga. v. United States, 206 F.Supp. 586 (S.D.Ga.1962)
 In Baton Rouge Bus Co. Abandonment, supra, the protestants of an abandonment application argued that the Commission was without jurisdiction to consider the application because the carrier had privately agreed to continue operating the line proposed for abandonment. The Commission correctly disagreed, reasoning that its jurisdiction is controlled by Congress and not by any private contractual arrangements. Baton Rouge Bus Co. Abandonment, supra, 275 I.C.C. at 5.
 In Burke County, Ga. v. United States, supra, protestants of an application for abandonment asserted that the applicant-railroad should be estopped from securing approval of its plan to abandon because the railroad had given oral assurances to certain affected communities that it would not abandon the line that served their needs. In affirming the Commission's order granting the abandonment, the court stated, "(i)f such agreements operated to prevent the Commission from authorizing abandonment even when the public convenience and necessity favored such authorization, the sole test for abandonment * * * would be thwarted." Burke County, Ga. v. United States, supra, 206 F.Supp. at 588 (citation omitted).
 It is clear that neither of these cases are controlling here. Baton Rouge and Burke County dealt with private agreements for continued service, and concerned the effect, if any, such agreements have upon the Commission's congressional directive to authorize abandonments when the public convenience and necessity requires such. This case does not raise that issue. Here, the protestants do not argue that the collective bargaining agreement restricts the ICC's jurisdiction, nor do they contend that the railroad is estopped from filing an application for abandonment. Furthermore, the agreement does not require continued operation of the line. The collective bargaining agreement provides that, notwithstanding abandonment, ICG is bound to indefinitely pay the wages of the Sioux Falls District's two crews. The protestants merely argue that, in assessing the benefits of abandonment to ICG, the Commission may not properly treat these wages as benefits, i. e., avoidable upon abandonment.
 
 
 [4]
 Our determination to engage in a searching inquiry of the record to find substantial evidence supporting the Commission's action is required in part because, first, the Commission rejected the result reached by its Administrative Law Judge, and, second, the Commission has admitted that its approach to this area of the law is in a state of confusion. See Greater Boston Television Corp. v. F.C.C., 444 F.2d 841, 850 (D.C.Cir.1970), cert. denied, 403 U.S. 923, 91 S.Ct. 2229, 29 L.Ed.2d 701 (1971)
 
 
 [5]
 We affirm the Commission's decision that property taxes may be treated as avoidable costs
 
 
 [6]
 In 1976, Congress enacted the Railroad Revitalization and Regulatory Reform Act (4-R Act) Pub.L.No.94-210, 90 Stat. 31 (1976); the Act brought about a significant change in the law governing the abandonment of rail lines and discontinuance of service. Before the 4-R Act, the statutory provisions regulating this area were intermingled throughout §§ 1(18)-(22) of the Interstate Commerce Act. The statutory changes reflected in the 4-R Act were codified as 49 U.S.C. § 1(a), and recodified as 49 U.S.C. §§ 10903-10905 (Supp. II 1978). The new Act affected abandonment proceedings in three significant respects. First, it expanded the type of public notice that a carrier must post prior to abandoning a line. Second, it provided that states or local communities, as well as shippers who qualify as significant users of a line, could offer financial assistance to a carrier who proposes to abandon a line and, thus, keep the line in operation. Finally, very strict time limits were imposed upon the parties to the abandonment proceeding and also upon the Commission in its processing of the abandonment application. See generally Johnson, The Railroad Revitalization and Regulatory Reform Act of 1976, 45 I.C.C. Practitioner's J. 27 (1977)
 
 
 [7]
 M. S. Stuckey, a representative of the United Transportation Union, testified without equivocation that labor contracts between the railroad and the union required the carrier to assign and pay wages to two crews between Cherokee, Iowa, and Sioux Falls, South Dakota:
 Judge Cappello: Let me see if I understand this. Is it your position that under this agreement the railroad is going to have to assign two crews between Cherokee and Sioux Falls even though the line is abandoned and even though the employees have been placed elsewhere on the line?
 The Witness: Your Honor, those were the preexisting conditions at the beginning of the turn of the century, and the company any time and that's the company's obligation, to
 Judge Cappello: (interrupting) Is your answer yes to my question?
 The Witness: The answer is yes.
 The only indication to the contrary in this record is an unsworn, unsupported denial by the carrier's attorney.
 
 
 [8]
 We are mindful of the fact that several proposals for railroad deregulation were introduced in the 96th Congress. On March 27, 1979, the Administration's proposals for regulatory reform in the rail industry were introduced in the Senate as S. 796, 96th Cong., 1st Sess., 125 Cong.Rec. § 3498 (1979). Similar proposals were introduced in the House on June 21, 1979, as H.R. 4570. H.R. 4570, 96th Cong., 1st Sess. (1979). The bills, which differed only in minor respects, essentially proposed the repeal of the present requirement that the ICC consider the "serious, adverse impact on rural and community development" in determining the public convenience and necessity. The Administration's proposal suggested that a certificate authorizing abandonment issue when: (1) there are no objections filed to the application, (2) the line's revenues do not exceed the avoidable cost of providing service on the line plus an adequate return on capital attributable to the line, and (3) the ICC finds that the benefit to the railroad in reinvesting its capital in other more lucrative markets exceeds the detriment to the protestants of the abandonment application. See generally Note, Proposed Regulatory Reform in the Area of Railroad Abandonment, 11 Transp. L.J. 213 (1979)
 Notwithstanding present support in Congress for railroad deregulation, we approach this case guided by the state of the law as it stands today. This case was originated under § 1(a) of the Interstate Commerce Act, recodified as 49 U.S.C. §§ 10903-10905 (Supp. II 1978). We are guided by that statute and our decision rests solely upon that statute.
 
 
 [1]
 Pub.L.No. 93-584 §§ 5 and 7 (Jan. 2, 1975) (eliminating three-judge district court procedure for review of orders of the Interstate Commerce Commission). See also 28 U.S.C. § 2342
 
 
 [2]
 This portion of the Bangor decision involved the calculation of a damage award against a carrier whose solicitation campaign on behalf of one line unduly prejudiced other connecting lines in the distribution of traffic
 
 
 [3]
 The old award decisions cited by petitioners, dating from 1955, 1941 and 1937 concededly guarantee pay for two crews on the line for every working day, regardless of whether the crews are actually used each day, but they do not begin to address any assertion that wages will be paid indefinitely despite cessation of service and abandonment of the line. See National Railroad Adjustment Board-First Division, Award 17194 (Docket No. 27306) (October 26, 1955) and National Railroad Adjustment Board-First Division, Award No. 5523 (Docket No. 11522) (March 19, 1941). The union admitted that the agreement did not contemplate abandonment. At most then, the union's testimony amounted to a claim that, given an abandonment, no immediate savings would be realized because the Sioux Line employees have the right to replace lesser-paid junior employees in other areas, or would fill existing vacancies. (P.Br. 1a-16a)
 
 
 [4]
 See Hilt Truck Line, Inc. v. United States, 532 F.2d 1199 (8th Cir. 1976)
 
 
 [5]
 In conjunction with an application for abandonment the Commission's section of Energy and Environment prepares an Environmental Threshold Assessment Survey (TAS) which can provide the basis for modifications or conditions on approval of an application. The TAS for the ICG's application concluded that this "abandonment proposal would not significantly affect the quality of the human environment."